LEXSEE 2007 U.S. DIST. LEXIS 9101

**SOULEYMANE M'BAYE, Plaintiff, -against- NEW JERSEY SPORTS PRODUCTION, INC., d/b/a/ MAIN EVENTS, and PATRICK C. ENGLISH, Defendants.**

**06 Civ. 3439 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 9101*

**February 7, 2007, Decided
February 7, 2007, Filed**

**PRIOR HISTORY:** *M'Baye v. World Boxing Ass'n, 2006 U.S. Dist. LEXIS 53869 (S.D.N.Y., July 28, 2006)*

**COUNSEL:** [*1] JUDD BURSTEIN, P.C. By: Judd Burstein, Esq., Peter B. Schalk, Esq., Michael C. Quinn, Esq., New York, NY, for Plaintiff.

ORLOFF, LOWENBACH, STIFELMAN & SIEGEL, P.A. By: Laurence B. Orloff, Esq., Philip E. Mazur, Esq., Roseland NJ, for Defendant New Jersey Sports Production, Inc. d/b/a Main Events.

KAVANAUGH, MALONEY & OSNATO, LLP. By: Steven M. Cordero, Esq., New York, NY, for Defendant Patrick C. English.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

   **CHIN, D.J.**

   Plaintiff Souleymane M'Baye, a professional boxer, brings this action alleging violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1962(c)* and *(d)*. Plaintiff also asserts various state claims. Defendants New Jersey Sports Production, Inc. ("Main Events") and Patrick English move separately to dismiss. For the foregoing reasons, the motions are granted in part and denied in part.

*BACKGROUND*

   This case is related to *M'Baye v. World Boxing Association*, No. 05 Civ. 9581 ("*M'Baye I*"), and the facts of the two cases overlap substantially. *See M'Baye v. World Boxing Association, 429 F. Supp. 2d 660 (S.D.N.Y. 2006)*.

   [*2] **I.** *Facts*

   For purposes of this motion to dismiss, the facts as alleged in the complaint are assumed to be true.

   **A.** *The WBA's Relationship With Main Events*

   Main Events maintains a close working relationship with the World Boxing Association (the "WBA"), one of the four major sanctioning organizations in boxing. (Complaint ("Compl.") P 29). At times, the WBA has provided special treatment for Main Events and the boxers it promotes. (*Id.*).

   For example, in February 2000, Lennox Lewis, a Main Events boxer at the time, was the WBA heavyweight champion. (*Id.* P 30). Pursuant to WBA rules, Lewis was required to defend his title against John Ruiz, the WBA's leading contender. (*Id.* P 31). Main Events, however, convinced the WBA to allow Lewis to fight Michael Grant, a higher profile opponent, without losing his title. (*Id.* P 32). The WBA did not sanction the

Case 1:07-cv-03893-LBS    Document 17-3    Filed 09/20/2007    Page 2 of 10

Page 2
2007 U.S. Dist. LEXIS 9101, *2

Lewis-Grant fight, but would have allowed it to proceed had Judge Kaplan not issued a ruling requiring Lewis to fight Ruiz -- or vacate his WBA heavyweight title. (*Id*. P 34). *See Lewis v. Don King Productions, Inc., 94 F. Supp. 2d 430, 446 (S.D.N.Y. 2000)*.

Another instance [*3] of favorable treatment involved Fernando Vargas, another Main Events fighter who captured the vacant WBA Super Welterweight title on September 21, 2001. (*Id*. P 36). Under WBA Rule 5.1.3, Vargas was obligated to defend his title against the WBA's Official Contender within 120 days. (*Id*.). Vargas, however, was never required to follow this rule because the WBA left the top ranking in the division "VACANT." (*Id*. P 37). The top ranking was left vacant even though Mamadou Thiam, the WBA's International Super Welterweight Champion at the time, could very well have been ranked the top contender. (*Id*. P 35). Under WBA Rule 10.3, the Ratings Committee should have taken into consideration the fact that Thiam held a regional title. (*Id*.). Instead, Thiam was ranked the number 2 contender from October 2001 through July 2002, and did not become the Official Contender until after the WBA sanctioned a high-profile September 2002 fight between Vargas and WBC Champion Oscar De La Hoya. (*Id*. P 37).

A third example involved Juan Diaz, a Main Events boxer who was ranked number 10 in the Lightweight division by the WBA when Lakva Sim captured the WBA Lightweight title on April 10, 2004. ( [*4] *Id*. P 48). Even though Sim was obligated to fight a non-Main Events boxer for his next opponent, the WBA nonetheless sanctioned a bout between Sim and Diaz. (*Id*.).

### B. *M'Baye Is Denied A Title Fight*

In 2001, Kostya Tszyu was recognized by the WBA as the Super Champion of the Super Lightweight division because he held the WBA, WBC, and IBF title belts for the 140 lbs. division. [1] (*Id*. P 41). As a result of his status as a Super Champion, the WBA sanctioned a bout for its regular championship between Randall Bailey and Diosbelys Hurtado on May 11, 2002. (*Id*. P 42). Hurtado won the bout, and under WBA Rule 5.1.3, was obligated to fight the Official Contender within 120 days of winning the title. (*Id*.).

    1  For a detailed description of the WBA's classification system of champions, *see M'Baye I,*

    *429 F. Supp. 2d at 662-63*.

On May 23, 2002, M'Baye paid a sanction fee to the WBA to fight Khalid Rahilou in an elimination bout for the Official Contender position in the [*5] WBA Super Lightweight division. (*Id*. P 43). M'Baye did so in reliance on the WBA's representation that the winner would be the next opponent for the WBA's regular champion. (*Id*.). Although M'Baye won the fight against Rahilou and was therefore entitled to a bout with Hurtado prior to the end of September 2002, the WBA never directed Hurtado to fight M'Baye. (*Id*. P 44).

The opportunity to face Hurtado was given, instead, to Vivian Harris -- a fighter promoted by Main Events who was not rated as a top 15 contender by the WBA in either the May or June 2002 rankings. (*Id*. PP 44, 47). It was not until July 2002 that Harris suddenly appeared in the WBA's rankings as the 15th rated contender. (*Id*. P 44). Harris's only activity during this time was a victory over an unranked opponent who had not won his prior fight, and had a journeyman's record of 18-8-2. (*Id*.). The WBA justified moving Harris to number 15 because of his 21-1 record. (*Id*. P 45). This appeared to be inconsistent with the WBA's own published ratings criteria, which takes into account four factors: (1) a victory over a rated boxer, (2) winning a regional championship, (3) a request by an affiliated [*6] Boxing Commission, or (4) important or powerful reasons for the WBA. (*Id*. P 45).

Nonetheless, Main Events, through Carl Moretti, arranged with the WBA to secure a ranking for Harris so that Harris would be permitted to fight Hurtado even though M'Baye was the Official Contender. (*Id.* P 46). In October 2002, Harris defeated Hurtado in an upset victory. (*Id.* P 47). Because M'Baye remained the Official Contender for Harris's title, Harris was required under the WBA rules to fight M'Baye no later than February 2003, but the WBA allowed Harris to delay fighting plaintiff until July 2003. (*Id.*). On July 12, 2003, Harris finally fought and defeated M'Baye to retain his title. (*Id.* P 49).

### C. *M'Baye Is Denied A Title Fight Again*

After losing to Harris, M'Baye dropped in the WBA rankings from number one to number six. (*Id.* P 51). He regained the number one ranking after winning two other fights. (*Id.*). On October 21, 2004, M'Baye won an elimination bout against Andreas Kotelnik -- a fight for which plaintiff paid a WBA sanction fee -- and was once

again designated the Official Contender in the Super Lightweight division. (*Id.*). Under the WBA's rules, [*7] plaintiff was entitled to fight Harris by no later than July 2005. (*Id.* P 52). Instead of sanctioning a second bout between Harris and M'Baye, however, the WBA decided to sanction a fight between Harris and Carlos Maussa. (*Id.* P 58).

Between December 2004 through March 2005, Maussa was unrated by the WBA. (*Id.* P 57). During this time, Maussa fought only once, and defeated Antonio Espitia, an opponent who had never before engaged in a professional fight. (*Id.*). Thus, as of March 2005, when the February 2005 rankings were issued, Maussa was ineligible to fight Harris for the WBA championship. (*Id.*). In April 2005, however, Maussa suddenly appeared in the number 15 position for the WBA's March 2005 rankings. (*Id.* P 58). The WBA's published explanation for this move in ranking was that Maussa "will fight Vivian Harris on June 25." (*Id.*). Thus, Maussa was placed in the number 15 position solely because he was scheduled to fight for the championship. (*Id.*).

By accepting the sanction fee from plaintiff, the WBA effectively represented to plaintiff that it would abide by its rules and regulations, and that plaintiff -- as the Official Contender -- would be [*8] given the opportunity to fight Harris by no later than July 2005. (*Id.* P 59). Plaintiff relied on these representations, and, accordingly, chose to make less money in the short run to preserve his ranking as the Official Contender. (*Id.*). Contrary to these representations, however, the WBA and Main Events had already agreed that Harris would be able to fight someone other than plaintiff for his next fight. (*Id.*).

### D. *M'Baye Is Denied A Title Fight For A Third Time*

On June 25, 2005, Maussa defeated Harris. (*Id.* P 60). Under WBA Rule 5.1.4, Maussa was obligated to fight plaintiff by no later than September 2005. (*Id.*). Notwithstanding plaintiff's position as the Official Contender, Main Events -- Maussa's promoter -- negotiated a fight with Ricky Hatton, an opponent with a higher profile. (*Id.* P 62). Main Events and Hatton's team were not willing to enter into a contract for the Maussa-Hatton fight unless they had a secret agreement with the WBA to sanction the bout. (*Id.*).

In August 2005, Main Events and Hatton's team orally agreed that Hatton and Maussa would fight a unification bout in the Fall of 2005. (*Id.* P 64). Around that time, the [*9] WBA secretly agreed that it would sanction the bout regardless of M'Baye's designation as the Official Contender. (*Id.* P 65).

On September 9, 2005, M'Baye heard the announcement that Hatton would be fighting Maussa. (*Id.* P 66). M'Baye's promoter wrote to the WBA objecting to the sanctioning of the bout, and demanded that the WBA order Maussa to fight M'Baye. (*Id.*). The WBA did not respond. (*Id.*).

From September 9 through September 23, 2005, M'Baye's promoter sent additional letters to the WBA making the same requests and referencing M'Baye's rights under the WBA rules as the Official Contender. (*Id.* P 67).

On or about September 21, 2005, Carl Moretti of Main Events spoke with a WBA official who informed him that the WBA needed to create a justification for sanctioning the Hatton-Maussa bout, in light of the objections made by plaintiff's promoters. (*Id.* P 68).

On September 22, 2005, Moretti sent an email to the WBA requesting a Special Permit under Rule 19. (*Id.* P 69). The email made it appear as if the WBA had not yet decided whether to sanction the Hatton-Maussa bout. (*Id.*).

On September 23, 2005, Patrick English, the principal attorney for Main [*10] Events, emailed Hatton's team on behalf of Main Events, and informed Hatton's team that they should make an application to the WBA for a Special Permit under Rule 19 so that the Hatton-Maussa bout could go forward. (*Id.* P 70). That day, Hatton's team, at the request of Main Events, joined in on the application for a Special Permit. (*Id.* P 71).

Less than 24 hours after the application for a Special Permit, Gilberto Jesus Mendoza of the WBA sent out a vote request to the members of the WBA Championship Committee. (*Id.* P 72). The request did not inform the Committee that M'Baye had objected to the sanctioning of the bout. (*Id.*). The Committee voted unanimously by email to grant the Special Permit within a few hours of the request for the vote. (*Id.* P 73). Although the decision had already been made, the WBA sought to conceal this fact. (*Id.* P 74).

On September 26, 2005, M'Baye's counsel faxed a letter to the WBA's counsel, confirming a conversation in which the WBA's counsel had informed plaintiff's counsel that the WBA had not yet granted the Special Permit. (*Id.* P 75). That same day, the WBA secretly sent notification that the Special Permit was granted [*11] to Main Events and to Hatton's team, while not revealing the decision publicly or to plaintiff's representatives. (*Id.* P 76).

From September 26 through October 6, 2005, the WBA continued to conceal the fact that it had approved the Hatton-Maussa fight. (*Id.* P 77). On October 6, plaintiff's counsel wrote the WBA's counsel complaining about the WBA's silence. (*Id.*). On October 7, the WBA's counsel notified plaintiff's counsel that the Special Permit had been granted. (*Id.* P 78). Counsel for Main Events and the Hatton team were copied on this letter. (*Id.*).

On November 3, 2005, a hearing for plaintiff's appeal of the WBA's decision to sanction the Hatton-Maussa fight commenced. (*Id.* P 81). The WBA upheld the issuance of the Special Permit on November 8th. (*Id.* P 83). It appeared, though, that the decision on the appeal had actually been reached prior to the hearing. (*Id.* P 84). For example, in an email dated November 7, 2005, Moretti wrote Robert Waterman of the Hatton team that: "I just returned from Korea where I was attending the WBA convention, ensuring in person, that we would have no problem with the WBA sanction, given the relentless pressure that [*12] Warren and his attorney placed on them. If it wasn't for the relationship that Maussa's co-promoter, Tuto Zabala & myself have with the WBA, travel & visas we wouldn't even be discussing this." (*Id.*; see Declaration of Laurence B. Orloff ("Orloff Decl.") Ex. C).

After the WBA denied plaintiff's appeal, plaintiff commenced *M'Baye I*, seeking, *inter alia*, to prohibit the WBA from sanctioning the Hatton-Maussa fight. (Compl. P 85). That case was brought in New York State Supreme Court, and was removed by the WBA to this Court. (*Id.*). In connection with that case, English submitted a declaration through the Court's ECF system. (*Id.* P 85(a)). In that declaration, English averred that "Mr. Maussa did not sign a contract to participate in the bout until the WBA World Championship Committee issued its sanctioning of the bout." (*Id.*). Main Events, however, received an executed bout contract dated September 8, 2005 from Maussa no later than September 17, 2005 -- nine days before the WBA formally issued the Special Permit, and five days before Main Events had even requested the Special Permit. (*Id.*).

On November 15, 2005, English also sent a letter to this Court claiming [*13] that Maussa did not sign a contract prior to the WBA's sanctioning of the bout with Hatton. (*Id.* P 85(b)). Carl Moretti submitted a similar declaration on November 15, stating that "[o]nly after the grant by the WBA of the Special Permit and sanction was a bout contract executed with Mr. Maussa." (*Id.* P 85(c)).

On November 18, 2005, English appeared before this Court, and claimed that neither Hatton nor Maussa executed contracts for their bout until after the WBA had granted the Special Permit. (*Id.* P 85(d)).

The Court declined to enjoin the Maussa-Hatton fight, but did enjoin the WBA from sanctioning any bout between the winner of the fight other than plaintiff. See *M'Baye I*, No. 05 Civ. 9581 (DC), 2006 U.S. Dist. LEXIS 53869, 2006 WL 2090081, at *1 (S.D.N.Y. July 28, 2006).

## II. *Procedural History*

On May 4, 2006, plaintiff filed a complaint against defendants Richard "Ricky" Hatton, Dennis Hobson, Robert Waterman, New Jersey Sports Production, Inc. d/b/a Main Events, Punch Promotions, Ltd., Fight Academy, Ltd., Patrick C. English, and Raymond Hatton. Plaintiff alleges that defendants: (1) engaged in a racketeering enterprise in violation of *18 U.S.C. § 1962(c)* [*14] (Compl. PP 95-103) [2]; (2) engaged in a RICO conspiracy in violation of *18 U.S.C. § 1962(d)* (*Id.* PP 104-07); (3) tortiously interfered with plaintiff's contract with the WBA (*Id.* PP 108-14); (4) tortiously interfered with plaintiff's prospective economic advantage (*Id.* PP 115-19); and (5) were unjustly enriched at the expense of plaintiff (*Id.* PP 120-22). Plaintiff also alleges that English violated *New York Judiciary Law § 487(1)*. (*Id.* PP 123-25).

> 2   Plaintiff does not explicitly allege a violation of *18 U.S.C. § 1962(c)*, but it appears, based on the allegations in the complaint, that plaintiff is referring to *§ 1962(c)*. (See Compl. APAP 95-103). The Court construes the claims accordingly. In addition, plaintiff states in his brief that he has not asserted a *§ 1962(c)* claim against English. (Plaintiff's Opposition to Motions to Dismiss ("Pl. Opp.") at 11) ("The complaint

does not purport to allege a *§ 1962(c)* claim against English, only a claim for RICO conspiracy under *§ 1962(d)*."). Thus, the *§ 1962(c)* claim is only alleged as to Main Events.

[*15] These motions to dismiss followed. On November 27, 2006, plaintiff voluntarily withdrew his claims against Punch Promotions, Ltd., Fight Academy, Ltd., Raymond Hatton, Ricky Hatton, Dennis Hobson, and Robert Waterman, without prejudice. Thus, the only remaining defendants are Main Events and English.

## DISCUSSION

A complaint may not be dismissed under *Fed. R. Civ. P. 12(b)(6)* "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. The test for dismissal is not whether the plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims. *Id.* "In considering a motion to dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*. [*16] The court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*.

I discuss plaintiff's claims in turn.

## I. RICO

### A. *Applicable Law*

To prevail on a civil RICO claim under *18 U.S.C. § 1962(c)*, a plaintiff must establish that: "(1) defendants (2) conducted or participated in conduct of (3) an enterprise's affairs (4) through a pattern (5) of racketeering activity (6) that caused injury to plaintiff's business or property." *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F. Supp. 1134, 1143 (S.D.N.Y. 1995)*. The requirements must be met as to each individual defendant. *See DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001)*; *see also United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987)*, cert. denied, *486 U.S. 1022, 108 S. Ct. 1995, 108 S. Ct. 1996, 100 L. Ed. 2d 227 (1988)* ("The focus of *section 1962(c)* is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are [*17] proscribed by *section 1962(d)*.").

A "pattern of racketeering activity" requires at least two acts of racketeering activity within a span of ten years. *See DeFalco, 244 F.3d at 306*. "Racketeering activity" is defined broadly by the statute, and encompasses various state and federal offenses including, among other things, fraud. *See 18 U.S.C. § 1961(1)*.

When alleging fraud as a predicate act, however, a plaintiff is subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)*. This requires the plaintiff to (1) detail the statements or omissions that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 187 (2d Cir. 2004)* (citation omitted). In short, a plaintiff must "set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Woods v. Empire Blue Cross & Blue Shield, No. 99 Civ. 4968 (DC), 2002 U.S. Dist. LEXIS 15251, 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002)* [*18] (quoting *United States ex rel. Thompson v. Columbia/HCA Health Care Corp., 125 F.3d 899, 903 (5th Cir. 1997))*.

Allegations of mail and wire fraud must also be pled with particularity in accordance with *Rule 9(b)*. *See Evercrete Corp. v. H-Cap Ltd., 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006)*; *Trs. of Plumbers, 886 F. Supp. at 1145*. Thus, if plaintiff claims that the mail or wire transmissions "were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred." *Evercrete Corp., 429 F. Supp. 2d at 624* (internal citations omitted). If, however, the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants. *Id.*

In addition, "[a] proper pleading of predicate acts based on mail and wire fraud requires an allegation [*19]

of an underlying fraudulent scheme. Where the fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall." *Morin v. Trupin, 711 F. Supp. 97, 105 (S.D.N.Y. 1989).*

While malice or intent may be averred generally, this does not give plaintiff "license to base claims of fraud on speculation and conclusory allegations." *Eternity Global, 375 F.3d at 187* (citations omitted). Rather, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Id.*

### B. *Application*

Here, plaintiff fails to state a claim under *§ 1962(c)* because plaintiff does not allege that Main Events made any fraudulent representations. Indeed, throughout the complaint, plaintiff only identifies fraudulent representations made by the WBA. (*See* Pl. Opp. at 19). For example, plaintiff asserts that when the WBA accepted his sanctioning fees, the WBA made a representation that it would follow its rules and regulations. (Compl. PP 43, 59). These, however, were representations made by the WBA, not by Main Events. [3] And although plaintiff states that he was "repeatedly injured [*20] by his reliance upon the representations of the WBA/Main Events enterprise" (Pl. Opp. at 8), plaintiff cannot impute representations made by the WBA to Main Events. Under RICO, a plaintiff must satisfy the requirements as to each individual defendant. *DeFalco, 244 F.3d at 306*.

> 3  As I held in *M'Baye I*, these allegations against the WBA are, at most, a failure to abide by a promise, and do not raise the required strong inference of fraudulent intent. *See M'Baye I, 429 F. Supp. 2d 660, 2006 WL 2090081, at *4.*

Because plaintiff is unable to allege fraudulent representations by Main Events, plaintiff has inadequately pled common law fraud. This failure means that plaintiff's "allegations of mail and wire fraud must also fall." *Morin, 711 F. Supp. at 105*. Thus, without adequately alleging the racketeering activity of fraud as to Main Events, plaintiff's RICO claim against Main Events cannot stand.

Despite the fact that plaintiff alleges no misrepresentations from Main Events, he nevertheless [*21] argues that his RICO and fraud claims should survive because there was a "sustained course of dealing between Plaintiff, on the one hand, and the WBA and its secret 'partner' Main Events, on the other." (Pl. Opp. at 8). Plaintiff then cites to various cases that allowed fraud claims to proceed based on the theory that a fraud claim is viable if there are facts showing that a defendant never intended to perform on a future promise. (*Id.*). Those cases, however, are not applicable because plaintiff had no course of dealing with Main Events. Plaintiff's only dealings were with the WBA, and he fails to allege any promises made by Main Events. Accordingly, because plaintiff fails to adequately allege fraud against Main Events, his RICO claim against Main Events is dismissed.

### II. *RICO Conspiracy*

### A. *Applicable Law*

*Section 1962(d)* makes it "unlawful for any person to conspire to violate any of the [substantive] provisions" of *§ 1962. 18 U.S.C. § 1962(d)*. For a finding of RICO conspiracy, "[t]here is no requirement of some overt act or specific act." *Salinas v. United States, 522 U.S. 52, 63, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997).* [*22] Thus, "[t]o establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions," and "that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 244-45 (2d Cir. 1999).*

Where a substantive RICO claim is deficient, a RICO conspiracy claim under *§ 1962(d)* must be dismissed. *See, e.g., First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 164 (2d Cir. 2004)* ("And because Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO conspiracy claims."); *Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006)* ("Case law in this Circuit confirms that a *§ 1962(d)* conspiracy claim must be dismissed where the substantive RICO claim is deficient.").

### B. *Application*

### 1. *Main Events*

As plaintiff's substantive RICO claim against Main Events is dismissed, plaintiff's [*23] RICO conspiracy claim against Main Events must also be dismissed. *See First Capital Asset Management, 385 F.3d at 164*; *Nat'l Group for Commc'ns, 420 F. Supp. 2d at 272*.

### 2. *English*

Plaintiff's RICO conspiracy claim against English is also dismissed. First, plaintiff does not make it entirely clear whether English is simply an agent acting on behalf of Main Events, or whether English is a party separate and apart from Main Events. (*See, e.g.*, Compl. P 32) ("Main Events, through either Carl Moretti [] or English, interceded with the WBA"); (*id.* P 70) ("Main Events, through an e-mail from English"). If English is simply an agent of Main Events, and acted only on behalf of Main Events, then the RICO conspiracy claim against him must be dismissed because the substantive RICO claim against Main Events is dismissed. *See First Capital Asset Management, 385 F.3d at 164*; *Nat'l Group for Commc'ns, 420 F. Supp. 2d at 272*.

On the other hand, if English is a separate party from Main Events, then the RICO conspiracy claim against him must also be dismissed because plaintiff does not allege an agreement between English [*24] and the other defendants to commit the predicate acts in furtherance of the alleged conspiracy. The failure to allege an agreement is the most basic element of a RICO conspiracy claim, and the lack of such an allegation is enough for dismissal. *See Cofacredit, 187 F.3d at 244* ("plaintiff must prove the existence of an agreement to violate RICO's substantive provisions"); *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990)* ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."); *Morin, 711 F. Supp. at 111* (must plead agreement, that defendants understood scope of enterprise, and that they knowingly agreed to further its affairs through the commission of various offenses).

Even assuming, however, that such an agreement was alleged, plaintiff's RICO conspiracy claim against English would still be insufficient because the predicate acts -- if carried out -- would not amount to a "pattern of racketeering activity." *Cofacredit, 187 F.3d at 244-45*. A "pattern of racketeering [*25] activity" requires at least two acts of racketeering activity within a span of ten years. *See DeFalco, 244 F.3d at 306*.

Here, plaintiff alleges that English engaged in multiple acts of fraud when he misrepresented to the Court that Maussa did not sign a contract to fight Hatton until after the Special Permit was issued. (Compl. PP 85(a)-(b), (d)-(e)). But, the different acts that constitute this misrepresentation -- *i.e.*, through an ECF filing, through a letter to the Court, and then when English appeared in Court -- are really subparts of the same misrepresentation. Plaintiff makes it appear as if they are each separate predicate acts, when in fact, they are nothing more than reaffirmations of the original misrepresentation. And, in the context of RICO, "courts must take care to ensure that [a] plaintiff is not artificially fragmenting a singular act into multiple acts." *Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997)*; *see also McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992)* (defendant's various acts in carrying out his alleged extortion threat constitute only a single predicate act); *Linens of Europe, Inc. v. Best Mfg., Inc., No. 03 Civ. 9612, 2004 U.S. Dist. LEXIS 18575, 2004 WL 2071689, at *16 (S.D.N.Y. Sept. 16, 2004)* [*26] ("[M]ultiple acts in furtherance of a *single* extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts.") (emphasis in original).

In short, the allegations concerning English amount to, at most, one act of fraud. They do not count as separate acts, and thus, would not make up the multiple acts required for a "pattern of racketeering activity." Accordingly, plaintiff's RICO conspiracy claim against English is dismissed.

### III. *State Claims*

Although the RICO claims are dismissed, and no federal question remains, the Court still has subject matter jurisdiction under *28 U.S.C. § 1332* because the requirements for diversity of citizenship are satisfied. Plaintiff is a citizen of France. (Compl. P 3). Main Events is organized under the laws of and has its principal place of business in New Jersey. (*Id.* P 4). English is a citizen of New Jersey. (*Id.* P 7). There is thus complete diversity.

### A. *Choice of Law*

Plaintiff alleges the following state claims: (1) tortious interference with contract; (2) tortious interference with prospective [*27] economic advantage; (3) unjust enrichment; and (4) violation of the New York Judiciary Law. The last claim is brought under New York

law, but a choice-of-law analysis is required for the other state claims.

Federal courts sitting in diversity must apply the choice-of-law rules of the forum state to determine the law applicable to the substantive issues. *Campbell v. Metropolitan Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001)*. Accordingly, New York's choice-of-law rules apply.

### 1. *Tortious Interference Claims*

To resolve choice-of-law issues in tort cases, New York applies an "interest analysis" to identify the state that has the "greatest interest" in the litigation. *See Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)*. Generally, when a choice-of-law issue relates to laws regulating conduct, the location of the tort determines the applicable law. *See AroChem Intern. Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992)*.

Here, the two tortious interference claims are governed by New York law because the majority of the alleged tortious conduct occurred in New York. (Compl. P 13). For example, the negotiations between [*28] Main Events and WBA -- regarding the three championship bouts that allegedly violated plaintiff's rights -- took place in New York. (*Id.*). English's alleged fraudulent submissions also took place in New York. (*Id.*). Accordingly, New York has the greatest interest, and its law applies for the tort claims.

### 2. *Unjust Enrichment*

In contract cases, New York courts apply a "center of gravity" or "grouping of the contacts" test and consider "a variety of significant contacts, including the place of contracting, the places of negotiation and performance, and the domicile or business of the contracting parties." *Tri-State Employment Services, Inc. v. Mountbatten Surety Co., 295 F.3d 256, 260-61 (2d Cir. 2002)* (citing *In re Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 613 N.E.2d 936, 597 N.Y.S.2d 904 (1993))*.

Here, plaintiff did not have any contractual dealings with Main Events or English. Thus, the only contacts at issue are the domicile of the parties. Plaintiff resides in France (Compl. P 3), but Main Events has its principal place of business in New Jersey (*id.* P 4), and English is a citizen of New Jersey (*id.* P 7). Accordingly, New Jersey [*29] law applies to the unjust enrichment claim because it has the most significant contacts.

### B. *Tortious Interference With Contract*

Under New York law, a plaintiff has to show the following for a tortious interference with contract claim: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006)* (citing *Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996))* (internal quotations omitted).

Plaintiff has properly alleged a tortious interference with contract claim as to both Main Events and English. In short, plaintiff alleges that: (1) there was a valid contract between plaintiff and a third-party -- the WBA (compl. PP 109-10); (2) both Main Events and English had knowledge of this contract (*id.* PP 111-12); (3) both Main Events and English intentionally procured the WBA's breach of contract, by, among other things, preventing [*30] plaintiff from obtaining title fights in spite of his status as the "Official Contender" (*id.* PP 46, 49, 62); (4) the WBA breached its contract by not following its regulations even though it accepted plaintiff's sanctioning fees (*id.* PP 43, 59); and (5) damages resulted from this breach (*id.* PP 113-14).

Main Events argues that because plaintiff's tortious interference and unjust enrichment claims are based, in part, on the same core facts as plaintiff's RICO and fraud claims -- that the plaintiff must satisfy *Rule 9(b)*'s heightened pleading standard with respect to the tortious interference and unjust enrichment claims. (Main Events' Motion to Dismiss ("Main Events Br.") at 21-22). Main Events cites *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)*, for this proposition. (Main Events Br. at 21).

Contrary to Main Events' suggestion, plaintiff's assertion of a fraud claim does not preclude him from alleging other claims without subjecting the latter to a heightened pleading standard. Nor does *Rombach* stand for that proposition. *Rombach* was a case where the plaintiff alleged securities fraud, and the court merely stated that the heightened pleading [*31] standard applied to those fraud claims. *355 F.3d at 170*. Here, plaintiff has properly pled a tortious interference with

contract claim that is distinct from his fraud claims. For example, plaintiff alleges that Main Events arranged for one of its fighters to receive a higher ranking than the fighter deserved, such that the fighter could obtain a title fight -- and therefore caused the WBA to breach its contract with plaintiff. (Compl. P 46). Plaintiff also alleges that English requested that a bout be sanctioned by the WBA even though the fight should not have been sanctioned, in light of plaintiff's status as the "Official Contender." (*Id.* P 69). Thus, plaintiff has sufficiently pled a tortious interference with contract claim that is separate and apart from his RICO fraud claims.

### C. *Tortious Interference With Prospective Economic Advantage*

Under New York law, a claim for tortious interference with prospective economic advantage requires that plaintiff allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used [*32] dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006)* (quoting *Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003))*.

With respect to the third element, New York requires that the defendant use "wrongful means," which include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions, and some degrees of economic pressure. *See Carvel Corp., 350 F.3d at 19*. More than simple persuasion is required. *Id*. Thus, "[t]o meet the third requirement, a plaintiff must demonstrate that the action complained of was motivated solely by malice or to inflict injury by unlawful means rather than by self-interest or other economic considerations." *Mahmud v. Kaufmann, 454 F. Supp. 2d 150, 162 (S.D.N.Y. 2006)*. Liability should arise "only where the conduct is highly reprehensible." *Carvel Corp., 350 F.3d at 19*.

Here, plaintiff's tortious interference with prospective economic advantage claims against both Main Events and English cannot survive because the third requirement [*33] is not satisfied. Plaintiff has not alleged that the actions of Main Events or English were wrongful such that they were motivated solely by malice or to inflict injury. *See Mahmud, 454 F. Supp. 2d at 162*. Rather, the allegations suggest that Main Events and English were motivated by their own economic self-interest. For example, plaintiff asserts that Main Events did not want Harris to fight plaintiff because Main Events would not have the promotional rights to plaintiff. (Compl. P 53). Plaintiff also asserts that Main Events negotiated for Maussa to fight Hatton as opposed to plaintiff because Hatton was more well-known and a higher profile opponent. (*Id.* PP 61-62). Moreover, nothing in the complaint suggests that English was motivated by anything other than his or Main Events own economic interests. In short, because plaintiff cannot satisfy the third element, his tortious interference with prospective economic advantage claim is dismissed.

### D. *Unjust Enrichment*

To establish unjust enrichment under New Jersey law, "a plaintiff must show both that defendant received a benefit and that the retention of that benefit without payment would be unjust." [*34] *In re Rezulin Prods. Liab. Litig., 390 F. Supp. 2d 319, 342 (S.D.N.Y. 2005)* (quoting *VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994))*. The benefit must have been conferred on the defendant by plaintiff, not by a third party. Id. In addition, plaintiff must show that he "expected remuneration from the defendant at the time [he] performed or conferred a benefit on the defendant." *Id*. (quoting *VRG Corp., 135 N.J. at 554*).

The unjust enrichment claims against both Main Events and English must be dismissed because plaintiff cannot establish that he conferred a benefit on defendants. Rather, any benefit that was received by Main Events and English could only have come from a third party -- which is insufficient for an unjust enrichment claim under New Jersey law. *In re Rezulin, 390 F. Supp. 2d at 342*; *VRG Corp., 135 N.J. at 554*.

Here, plaintiff asserts that the defendants were unjustly enriched by the money they received for "promoting fighters who wrongfully usurped Plaintiff's status as Official Contender . . . at Plaintiff's expense." (Pl. Opp. at 22). The money received [*35] by Main Events and English, however, was not from plaintiff. Rather, any money that the defendants received came from a third party.

Notwithstanding the attenuated nature of the relationship between plaintiff and defendants, plaintiff argues that the unjust enrichment claims should withstand dismissal because a similar claim was upheld against the WBA in *M'Baye I*. That argument is rejected. In *M'Baye I*

, the unjust enrichment claim was premised on the theory that "it would be inequitable for the WBA to retain the sanctioning fees that [plaintiff] paid" to the WBA. *2006 U.S. Dist. LEXIS 53869, 2006 WL 2090081, at *5*. Plaintiff therefore had direct dealings with the WBA, and he could thus establish that he conferred a benefit on the WBA. Here, plaintiff cannot establish that he conferred a benefit on either Main Events or English because he had no direct dealings with either of them.

Accordingly, plaintiff's unjust enrichment claims against both Main Events and English are dismissed.

### E. *New York Judiciary Law § 487(1) - English*

*Section 487(1) of the New York Judiciary Law* provides, in relevant part, that:

> An attorney or counselor who . . . [i]s [*36] guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

*N.Y. Jud. Law. § 487* (McKinney 2005).

Thus, under this law, plaintiff has to show that English: (1) is guilty of deceit or collusion, or consents to any deceit or collusion; and (2) had an intent to deceive the court or any party. *Id*. A plaintiff also has to establish that damages were caused by the deceit. *See Amalfitano v. Rosenberg, 428 F. Supp. 2d 196, 207 (S.D.N.Y. 2006)*.

"A single act or decision, if sufficiently egregious and accompanied by an intent to deceive, is sufficient to support liability." *Trepel v. Dippold, No. 04 Civ. 8310 (DLC), 2005 U.S. Dist. LEXIS 8541, 2005 WL 1107010, at *4 (S.D.N.Y. May 9, 2005)*.

Plaintiff alleges that English is liable under *§ 487(1)* for misrepresenting to this Court, on more than one occasion, that Maussa did not sign a contract to fight Ricky Hatton until after the WBA issued its Special Permit. (Compl. PP [*37] 85(a)-(b), (d)-(e)). Plaintiff argues that this misrepresentation caused the Court to refrain from enjoining the Hatton-Maussa fight, which caused him to be damaged.

In short, plaintiff has sufficiently alleged a claim under *§ 487(1)*. He alleges that English is (1) guilty of deceiving the Court; (2) had an intent to deceive the Court; and (3) was damaged by this deception when this Court declined to enjoin the Hatton-Maussa fight.

English argues that the documentary evidence that he submitted shows that he made no misrepresentation to this Court. (Memorandum of Law in Support of Defendant Patrick C. English's Motion to Dismiss ("English Br.") at 25-26). At this stage of the litigation, however, the Court must accept plaintiff's allegations as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim, 79 F.3d at 321*. Although certain documentary evidence suggests that the final contract between Maussa and Hatton was not executed until *after* the WBA sanctioned the fight, other documents show that Maussa signed a contract before. The Court cannot weigh the evidence at this point.

Moreover, English also argues that plaintiff has not alleged this [*38] deception with specificity as required by *Rule 9(b)*. (English Br. at 25-26). This argument is rejected. English cites no law to show that allegations under *§ 487* must be pled with particularity, and an allegation that a defendant has deceived a court is not the same as an allegation of fraud under *Rule 9(b)*. Moreover, plaintiff's allegations in this respect are specific. Thus, the Court denies English's motion to dismiss the *§ 487* claim.

### *CONCLUSION*

The motion to dismiss is granted with respect to all the claims except: (1) the tortious interference with contract claim against Main Events and English; and (2) the *§ 487* claim against English. Plaintiff's request for leave to amend the RICO and RICO conspiracy claims is denied. Accordingly, plaintiff may proceed with is tortious interference with contract claim against Main Events and Patrick English and his *§ 487* claim against English.

SO ORDERED.

Dated: New York, New York

February 7, 2007

DENNY CHIN

United States District Judge