**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STRUCTURE PROBE INC., | |
| *Plaintiff*, | |
| v. | Case No. 07-CV-3893 (LBS) |
| EMS ACQUISITION CORP. (d/b/a, ELECTRON MICROSCOPY SCIENCES), | **FILED ELECTRONICALLY** |
| *Defendant*. | |

**<u>DECLARATION OF MICHAEL J. FRENO</u>**
**<u>IN OPPOSITION TO EMS'S MOTION TO DISMISS</u>**

I, Michael J. Freno, hereby declare as follows:

1.      I am an attorney-at-law of the State of New York and an associate of Kenyon & Kenyon LLP, attorneys for plaintiff Structure Probe Inc. ("SPI").

2.      Annexed hereto are true and correct copies of the following documents:

| | |
|---|---|
| Exhibit 1 | *Microsoft Corp. v. AGA Solutions, Inc.,* No. 05-5796 (DRH) (MLO), 2007 U.S. Dist. LEXIS 19241 (E.D.N.Y. Mar. 12, 2007) |
| Exhibit 2 | *Colour & Design v. U.S. Vinyl Mfg. Corp.*, No. 04-8332 (MBM), 2005 U.S. Dist. LEXIS 10964 (S.D.N.Y. May 19, 2005) |
| Exhibit 3 | *NetTech Solutions, L.L.C. v. ZipPark.com*, No. 01-2683 (SAS), 2001 U.S. Dist. LEXIS 14753 (S.D.N.Y. Sept. 20, 2001) |

I declare under penalty of perjury that the foregoing is true and correct.

_____
MICHAEL J. FRENO

DATED:  October 9, 2007
        New York, New York

# EXHIBIT 1

LEXSEE 2007 U.S. DIST. LEXIS 19241

**MICROSOFT CORPORATION, a Washington corporation, Plaintiff, -against-AGA SOLUTIONS, INC., a New York Corporation, d/b/a/ ADVANCED SOFT-WARE SOLUTIONS and ADVANCED COMPUTER SOLUTIONS; MITCHELL S. ACKERMAN, a/k/a/SCOTT SIMON, WANTAMANSION, and MEGA-HERTZ932, an individual; and LEE K. ACKERMAN, a/k/a/ PASSPORT 2002, an individual; Defendants.**

**05 CV 5796 (DRH)(MLO)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 19241*

**March 12, 2007, Decided
March 12, 2007, Filed**

**COUNSEL:** [*1] YARMUTH WILSDON CALFO PLLC, Attorneys for Plaintiff, Seattle, WA, By:Scott T. Wilsdon, Esq., John Jamnback, Esq.

CONRAD O'BRIEN GELLMAN & ROHN, P.C., Attorneys for Defendants, Philadelphia, PA, By: Geoffrey L. Beauchamp, Esq., Craig D. Harvath, Esq.

NAIBURG, ROSENBLUM & WEISSMAN, LLP, Attorneys for Defendant, Central Islip, NY, By: Eric W. Naiburg, Esq.

**JUDGES:** Denis R. Hurley, Senior District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM OF DECISION & ORDER**

**HURLEY, Senior District Judge:**

Plaintiff, Microsoft Corporation, ("Plaintiff" or "Microsoft") commenced this lawsuit asserting various causes of action premised on Defendants alleged distribution of counterfeit or unlicensed software and components. Presently before the Court are two motions. One motion is by Defendants Mitchell S. Ackerman ("Ackerman") and AGA Solutions, Inc. ("Solutions") to dismiss the third (Lanham Act), fifth (New York Deceptive Trade Practices Act), eighth (unjust enrichment) and ninth (accounting) causes of action in the First Amended Complaint. The second motion is by Defendant Lee K. Ackerman ("Lee") to dismiss all claims asserted against

her. [1] For the reasons set forth below, the [*2] motions to dismiss are GRANTED as to the eighth [2] and ninth cause of action but are otherwise DENIED.

1   The original motions had also requested that the instant action be stayed pending the completion of criminal proceedings pending against Ackerman. During the pendency of these motions, the parties advised the Court that the criminal proceedings have concluded. Accordingly, the motions for a stay are denied as moot.

2   Plaintiff does not contest the dismissal of this cause of action. Accordingly, the motions to dismiss the eighth cause of action is granted.

*Background*

The following allegations are taken from the First Amended Complaint ("FAC" or complaint).

Microsoft develops, advertises, markets, distributes and licenses a number of computer programs. These programs are recorded on magnetic diskettes and CD-ROMs and are packaged and distributed with associated proprietary materials such as user's guides, manuals and end user license agreements. The software programs are distributed with Certificates [*3] of Authenticity and/or Certificate of Authenticity Labels (referred to as "COAs" or "COALs") which are manufactured with security features to make duplication difficult. The COAs help end-users verify they have genuine Microsoft software. [FAC PP10-11.] Microsoft specifically alleges that it holds copyrights for the following software and associated

user's reference manuals, user's guides, and screen displays: Microsoft Windows XP Professional, Microsoft Windows XP Professional x64 Edition, and Microsoft Windows XP Home, Microsoft Windows 2000 Professional, Microsoft Windows 98, Microsoft Windows 2003 Server, Microsoft Windows 2000 Server, Microsoft Windows NT Workstation 4.0, suites of software programs known as Microsoft Office 2003 (and associated programs), suites of software program known as Microsoft Office XP (and associated programs), suites of software programs known as Microsoft Office 2000 (and associated programs), Microsoft Office 97 Professional Edition, Microsoft Exchange Server 2003 Enterprise, Microsoft SQL Server 2000, Microsoft Office FrontPage 2003, Microsoft One Note 2003, Microsoft Project 2003, Microsoft Project 2002, Microsoft Publisher 2002, Microsoft Visio [*4] 2003 Professional, Microsoft Visual Studio .NET Enterprise Architect 2003, Microsoft Business Contact Manager and it is the sole owner and licensor thereof. [FAC PP 12-31; 54.] In addition, Microsoft has registered trademarks and service marks for, inter alia, Microsoft, Windows, Windows flag logo, Colored Windows Logo, Powerpoint, and Outlook. [FAC P32.]

Ackerman and Lee are husband and wife. Ackerman is a director, officer and shareholder of Solutions. According to the Complaint, Ackerman and Lee both personally participated in and/or had the right and ability to supervise, direct and control the wrongful conduct alleged. [FAC P 5-6.]

Through the use of two websites and at least three internet action accounts, Defendants advertised, distributed and sold counterfeit, tampered and infringing software and components covered by Microsoft's copyrights and trademarks. This activity took place at least through November 2005 and the operation was run from Ackerman's and Lee's residence. [FAC P 36.] Ackerman, also known as Scott Simon, registered the accounts "wantamansion" and "megahertz932" with the on-line auction service Ebay and used these accounts to sell illegal software [*5] through December 2004 and January 2005. Lee registered an account with Ebay and posted illegal software under the name "passport2002" until at least March 2002. [FAC PP 34-35.]

Beginning about May 2002, Microsoft began to receive complaints from individuals and businesses about software they had purchased from Defendants. Upon analyzing the software purchased by these third parties, as well as test purchases made by private investigators hired by Microsoft, Microsoft determined that much of the software was counterfeit, had security features that had been tampered with and/or were unlicensed or infringing. [FAC PP 36-41.] Also, in July 2005, United States Custom Agents seized a shipment of 50 units of Microsoft Windows XP Professional that entered the United States from China and whose intended recipient was Ackerman using an alias. A sample unit analyzed by Microsoft confirmed that the software, COA Label and manual were counterfeit. [FAC PP 42-44.]

In the Fall of 2005, approximately 2,500 units of counterfeit, tampered and/ or infringing Microsoft software were seized from Ackerman's and Lee's joint residence pursuant to a search warrant. Apparently, the basement of the residence [*6] had been set up to function as an office, with five work stations, a shrink wrap machine and various shipping materials. Also seized from the residence were COA labels, Product Key labels, End User License Agreements and other software related components covered by Microsoft's copyrights and bearing Microsoft's registered trademarks or imitations thereof. [FAC P 45-47.]

At least through December 2005, Defendants also maintained a website that prominently displayed a large number of Microsoft products and represented that Defendants sell only genuine Microsoft products. In addition, the Website includes photos of a brick store front when in fact the business was operated from Ackerman's and Lee's residence and a private mailbox in Jericho, New York. [FAC PP 49-51.]

This action was filed on December 13, 2005. The complaint alleges nine causes of action. The first cause of action is for copyright infringement. The second cause of action is for trademark infringement pursuant to *15 U.S.C. § 1114, et seq.* The third cause of action is asserted pursuant to *15 U.S.C. § 1125 et seq* and is for false designation of origin, false description [*7] and false representation of Microsoft packaging. The fourth cause of action is for trafficking in counterfeit labels, illicit labels and counterfeit documentation and packaging in violation of *18 U.S.C. § 2318.* The fifth cause of action is for violation of New York State's Deceptive Trade Practices Act, *N.Y. Gen. Bus. Law § 349.* The sixth, seventh and eighth causes of action assert claims for common law unfair competition, imposition of a constructive trust and unjust enrichment, respectively. The ninth and final cause of action seeks an accounting pursuant to *17 U.S.C. § 504,* 15 U.S.C. § 117, and *18 U.S.C. § 2318.*

Lee has moved to dismiss all causes of action asserted against her on the grounds that they are barred by the three year statute of limitations period applicable to each of the claims and because they fail to sufficiently allege her active involvement in the alleged wrongful acts. Lee, Ackerman and Solutions all move to dismiss the third, fifth, and ninth causes of action as legally insufficient.

## DISCUSSION

### I. Standard for Motion  [*8]   *to Dismiss*

The court may not dismiss a complaint under *Rule 12(b)(6)* unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *King v. Simpson, 189 F.3d 284, 286 (2d Cir. 1999); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. The complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Fed. R. Civ. P. 8(a)(2)*). Thus, "a plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006)*. Nonetheless, "a plaintiff's allegations, accepted as true, must be sufficient to establish liability." *Amron v. Morgan Stanley Investment Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006)*.

In construing a complaint on a Rule 12(b)(6) motion, the Court must accept all factual allegations in the proposed complaint as true and draw all reasonable inferences in favor of [*9] the plaintiff. *King, 189 F.3d at 287; Jaghory v. New York State Dep't. of Educ., 131 F.3d 326, 329 (2d Cir. 1997)*. The Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir. 1999); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)*.

### II. Lee's Motion to Dismiss

Lee seeks dismissal of all claims asserted against her on the grounds that the complaint fails to sufficiently allege her participation in the alleged wrongful conduct and on statute of limitations grounds. The court will address these arguments ad seriatim.

#### A. Participation in the wrongful acts.

"To withstand a motion to dismiss, a complaint based on copyright infringement must allege: (1) which original works are subject of the copyright claim; (2) that the plaintiff owns the copyright in those works; (3) that the copyright has been registered in accordance with the statute; and (4) 'by what acts [*10] during what time' the defendants infringed the copyright." *Carell v. Shubert Org., 104 F. Supp. 2d 236, 251 (S.D.N.Y. 2000)* (quoting *Kelly v. L.L. Cool J., 145 F.R.D. 32, 35 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994)*. [3] The first three requirements are not at issue on this motion and, indeed, the Court's review of the complaint confirms that they have been sufficiently pled. Lee's claim is that the complaint does not sufficiently allege "by what acts and during what time" she is alleged to have infringed the copyright. The Court disagrees.

3   Both Lee and Microsoft focus on whether Lee's participation is sufficient for liability under the Copyright Act and therefore so shall this Court.

The complaint more than adequately describes that (1) Lee and Ackerman operated, from their joint residence, an internet based business though two websites, one of which was registered to Lee, and through three internet auctions and a private mailbox; (2) how, through [*11] that business, they advertised, distributed and sold counterfeit, tampered and infringing software and components; and (3) the approximate period of time that the conduct occurred. Additionally, the complaint describes more than a dozen instances in which Microsoft acquired unlicensed, counterfeit and infringing software distributed by Lee and Ackerman.

Lee posits that her "active involvement in the wrongful acts cited by Microsoft is confined to her use of an eBay account in the name of 'Passport2002,' her alleged title as the company's 'head of shipping,' the appearance of her name on some software packaging and her identification as a 'contact point'" and that this alleged conduct is insufficient. Mem. In Supp. Of Motion by Def. Lee Ackerman to Dismiss Claims Against Her at 5-7 ("Lee Mem."). However, "[a]mong the exclusive rights that the Copyright Act bestows upon copyright owners is the right 'to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership.'" *Island Software and Comp. Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005)* (citing *17 U.S.C. § 106(3)*). Therefore, even assuming [*12] insufficient allegations that Lee actually copied Microsoft's products, sufficient facts have been alleged to hold Lee liable as the distributor of unauthorized copies. *See id.* (citing *Salton, Inc. v. Phillips Dom. Appliances and Pers. Care B.V., 391 F.3d 871, 875 (7th Cir. 2004); Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62 (1st Cir. 2002))*.

The Court rejects Lee's argument that the claims against her should be dismissed because the allegations against her demonstrate that her role was "de-minimus" and "insubstantial" (Lee Mem. at 2-3 & 13). Microsoft has satisfied its pleading requirement and therefore is entitled to discovery to explore the exact contours of Lee's involvement. Moreover, the concept of "de minimus" in copyright law is limited to the inquiry undertaken to determine if one work is an unauthorized copy of another. *See, e.g. Miroglio S.P.A. v. Conway Stores, Inc., No. 05 Civ. 00121, 2007 U.S. Dist. LEXIS 8034, 2007 WL 391565 at *5 (S.D.N.Y. 2007)* (To demonstrate unauthorized copying, the plaintiff must show "(I) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more

than de minimus. [*13]  "") (quoting *Turfenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003)*). Lee cites no cases holding that the concept of "de minimus" should be extended to require that a defendant's participation in infringing activity be alleged to be more than "de minimus." This Court will not impose such a requirement.

Accordingly, the motion to dismiss for failure to sufficiently allege Lee's participation in the wrongful acts is denied.

**B. Statute of Limitations**

Lee also argues that the claims against her are all governed by three year statute of limitations and are therefore barred because the complaint was filed more than three years after March 2002, the last alleged "active" involvement by her. (Lee Mem at 10.) The argument must fail as the complaint alleges wrongful conduct by Lee in 2004 and 2005 (FAC PP 19, 37-39), well within the statute of limitations periods applicable to the copyright, trafficking and New York deceptive practices claims against her. *See 17 U.S.C. § 507(b)* (copyright action must be commenced within three years of accrual of the claim); *18 U.S.C. 2318(f)(6)* [*14] (statute of limitations for trafficking in illicit labels is three years); *M & T Mortg. Corp. v. Miller, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004)* (claims under New York Deceptive Practices Act governed by three year statute of limitations). As to those acts alleged in the complaint that occurred more than three years prior to the filing of the complaint, dismissal is not warranted as this stage of the proceeding because as to copyright claims, accrual begins when the plaintiff knows or should have known of the injury on which the claim is premised. *See Merchant v. Levy, 92 F.3d 51, 56 (2d Cir 1996)*. Moreover, Lanham Act claims are subject to laches. *See Conopco, Inc. v. Campbell Soup, 95 F.3d 187, 192 (2d Cir. 1996)*; *accord U.S. v. Milstein, 401 F.3d 53, 63 (2d Cir. 2005)*. Accordingly, Lee's motion to dismiss all causes of action on the grounds they are barred by the statute of limitations is denied.

***III. Dismissal of the Section 43(a) Lanham Claim***

*Section 43(a)* of the Lanham Act provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for [*15] goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

(B) in commercial advertising promotion, misrepresents the nature characteristics, qualities, or geographic origin of his or her or another's goods, services, or commercial activities,

shall be liable in a civil action by any such person who believes that he or she is likely to be damaged by such act.

*15 U.S.C. § 1125(a).*

Defendants argue that the section 43(a) claim must be dismissed because "Microsoft has not alleged that Defendants falsely represented that they [defendants] owned Microsoft works and because it is duplicative of the copyright claim." Ackerman Mem. at 12-13.

*Section 43(a)* of the Lanham Act is a broad federal unfair competition [*16] statute whose purpose is to prevent consumer confusion as to the source or sponsorship of a product. *Chambers v. Time Warner Inc., 282 F.3d 147, 155 (2d Cir. 2002)*. To prevail on a claim under *§ 43(a)*, a plaintiff must plead and prove that it has a valid mark entitled to protection and defendants' used a similar mark in commerce in a way that would likely cause confusion among the consuming public. *See Arrow Fastener Co., Inc., v. Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995)*.

*Section 43(a)* protects against false advertising, passing off and "reverse passing off." *Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir. 1994)*; *see Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 196-97 (2d Cir. 2001)*. Passing off is when "'A' sells its product under 'B's' name." *Id.* Passing off is also known as "palming off" in the sense that A palms its goods off as B's. Reverse passing off is when "'A' sells 'B's' product under 'A's' name." *Waldman, 43 F.3d at*

780. "For example, the defendant in *Arrow United Indus. v. Hugh Richards Inc., 678 F.2d 410 (2d Cir. 1982)*, used [*17] a product (an industrial damper) manufactured by the plaintiff, Arrow, reduced it slightly, affixed its own identifying marks and represented to a customer that the product was its own . . . The court held that this activity constituted 'affixing' a false designation of origin' in violation of the Lanham Act. . . . The designation was false because Arrow was the true manufacturer of the product, and by affixing its name, Richards misappropriated Arrow's manufacturing talents." *Waldman, 43 F.3d at 780.*

As the above illustration makes evident, in this case Microsoft is alleging passing off -- not reverse passing off. Microsoft's allegations are that Defendants are selling their counterfeit software under Microsoft's name. The cases relied upon by Defendants for the proposition that there must be an allegation that they falsely represented that they owned Microsoft's works, *e.g., Cognotec Services Ltd. v. Morgan Guaranty Trust Co. of N.Y., 862 F. Supp. 45, 51 (S.D.N.Y. 1994)* involve reverse passing off and are therefore inapplicable to this case. No such allegation is required in a passing off case. *See, e.g., Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 455-56 (S.D.N.Y. 2005).* [*18]

Nor should the § 43(a) claim be dismissed as duplicative of Microsoft's copyright claim. Although the Second Circuit has rejected attempts to turn a successful copyright claim into a Lanham Act claim for false designation of origin, *see Kregos v. Assoc. Press, 937 F.2d 700, 710-11 (2d Cir. 1991)*, it has done so only when the sole ground "is the existence of a false copyright notice . . . ." *Lipton v. The Nature Co., 71 F.3d 464, 473 (2d Cir. 1995). See also Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 37 (2d Cir. 1982)* (where copyright notice was not merely false but made representation that the product was original, Lanham Act claim upheld). Here, Microsoft has alleged that "Defendant's wrongful conduct includes the use, advertising, marketing, offering or distribution of Microsoft's marks, names and /or imitation visual designs . . . that are virtually indistinguishable from Microsoft's visual design, in connection with their goods and services." Thus, Microsoft is not relying solely upon the existence of a false copyright notice.

Accordingly, Defendants' motions to dismiss the third cause of action are denied.

[*19] *IV. New York Deceptive Trade Practices Act*

New York's Deceptive Trade Practices Act provides in pertinent part:

(a) Deceptive practices or acts in the conduct of any business, trade or commerce, or in the furnishing of any service in this state are hereby declared unlawful.

. . .

(h) . . .[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.

*N.Y. Gen. Bus. Law § 349.*

Defendants' challenge to this claim is two-fold. First, they argue that the claim must fail because, citing *Goshen v. Mutual Life Ins. Co. of N.Y., 98 N.Y.2d 314, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002)*, "Microsoft does not allege any deceptive acts that occurred in the State of New York. Second, they argue that Microsoft fails to allege how it has been injured by reason of any alleged violation of *§ 349.* Ackerman Mem. at 14-15. Both these claims must fails.

The complaint clearly alleges that Defendants, who operated out of their New York residence, distributed and sold "to residents [*20] of New York and elsewhere" "counterfeit, tampered and/or infringing software that is inferior to genuine Microsoft software." [FAC P 91.] These allegations are sufficient to meet the requirement set forth in *Goshen* "that the transaction in which the consumer is deceived must occur in New York." *98 N.Y.2d at 325.* This is not a case, like *Goshen,* in which only the mere formulation of a plan to deceive occurred in New York. *See id.* New York courts have allowed out of state competitors to bring suit when there is harm to the New York public. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995).*

The complaint also sufficiently alleges that Defendants' acts have damaged Microsoft's goodwill and reputation and have resulted in losses to Microsoft. [FAC P92.] Competitors may assert claims under the statute as long as there is some harm to the New York public at large. *Oswego, 85 N.Y.2d at 25.*

The motions to dismiss the fifth cause of action under the New York Deceptive Trade Practices Act are denied.

*V. The claim for an accounting*

In its ninth cause of action, Microsoft seeks [*21] an accounting from the defendants for all profits allegedly received by them "attributable to their acts of infringement" in violation of *17 U.S.C. § 504, 15 U.S.C. § 1117* and *18 U.S.C. § 2318.* [FAC PP108-10.] Defendants seek dismissal on the grounds that "to the extent this claim is based on the defendants' alleged infringe-

2007 U.S. Dist. LEXIS 19241, *

ment of Microsoft's copyrights it applies to claims be-tween co-owners of the same copyright. The motions to dismiss are granted but not on the grounds argued by Defendants.

An accounting is a remedy provided for by the Copyright Act, the Lanham Act and *18 U.S.C. § 2318*. It is not a basis for liability and therefore is not assertable as a cause of action. Whether the Plaintiff is entitled to the *remedy* of an accounting is not a question to be an-swered on a motion to dismiss. As a cause of action, the claim for an accounting is dismissed. [4]

> 4   The Court notes that, in fact, Microsoft re-quests an accounting as part of the relief sought in the "Wherefore clause" of the complaint.

[*22] ***Conclusion***

For the reasons set forth above, the motions to dis-miss are GRANTED as to the eighth and ninth causes of action but otherwise DENIED. The motion for a stay is DENIED as moot.

**SO ORDERED.**

Dated: Central Islip, New York

March 12, 2007

Denis R. Hurley

Senior District Judge

# EXHIBIT 2

LEXSEE 2005 U.S. DIST. LEXIS 10964

**COLOUR & DESIGN, Plaintiff, -against- U.S. VINYL MANUFACTURING COR-
PORATION and STEVEN W. MCCLOUD, Defendants.**

**04 Civ. 8332 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2005 U.S. Dist. LEXIS 10964*

**May 19, 2005, Decided
June 3, 2005, Filed**

**DISPOSITION:**     [*1]  Defendants' motions denied.

**COUNSEL:** MARC A. LIEBERSTEIN, ESQ., (Attorney for Plaintiff), PITNEY HARDIN LLP, New York, NY.

ARTHUR M. PESLAK, ESQ., (Attorney for Defendant), MANDEL & PESLAK LLC, Freehold, NJ.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Colour & Design, Inc. ("Colour & Design") sues U.S. Vinyl Manufacturing Corporation ("U.S. Vinyl") and its president and CEO, Steven W. McCloud, for copyright infringement, *17 U.S.C. § 101 et seq.* (the "Copyright Act"), and unfair competition under New York state law. Defendants move to dismiss the complaint for lack of personal jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)* and the unfair competition claim for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*. Alternatively, they move to transfer this case to the Northern District of Georgia pursuant to *28 U.S.C. § 1404(a)*. For the reasons set forth below, the motions are denied.

I.

Colour & Design, an Arkansas corporation, owns the copyrights to the "Sarda" [*2] and "Cambria Stripe" (collectively, "plaintiff's patterns") wallcovering patterns.

(Compl. PP1, 8) U.S. Vinyl, a Texas corporation head-quartered in the Northern District of Georgia, manufactures and sells wall coverings entitled "Fiery Red," "Sunflower," "Shantung Gold," "Shantung Copper," "Peridot II," and "Sunwashed Stripe." (collectively, "infringing patterns") (Id. PP2, 11) According to Colour & Design, these patterns "are nearly identical copies of and are substantially and confusingly similar to the overall appearance of [plaintiff's patterns]." (Id. P11) Colour & Design filed the instant complaint on October 21, 2004.

II.

This court has subject matter jurisdiction pursuant to *28 U.S.C. § 1338(a)* (original jurisdiction over federal copyright claims) and *Section 1338(b)* (original jurisdiction over unfair competition claims when joined with a substantial and related federal copyright claim). On a motion to dismiss for lack of personal jurisdiction under *Fed. R. Civ. P. 12(b)(2)*, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendants" by a preponderance of the evidence. [*3] *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)*. At the motion to dismiss stage, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor. . . ." *A.I. Trade Fin. Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)*.

III.

The jurisdictional analysis is the same for both U.S. Vinyl and Steven McCloud, who can be held individually liable for the acts of infringement and unfair competition. See, e.g., *Editorial Musical Latino Americana, S.A. v. MAR Int'l Records, Inc., 829 F. Supp. 62, 64 (S.D.N.Y. 1993)*. In federal copyright cases, the law of the forum state governs whether a party is subject to per-

sonal jurisdiction. See *Design Tex Group, Inc. v. 2005 U.S. Dist. LEXIS 2143, U.S. Vinyl Mfg. Corp., No. 04-5002, 2005 WL 357125, at \*1 (S.D.N.Y. Feb. 14, 2005)* (citing *PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997)).*

The New York long-arm statue provides:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary [\*4] . . . who in person or through an agent:

. . .

(2) commits a tortious act within the state. *N.Y. CPLR 302(a).* "Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction over the infringers." *Editorial, 829 F. Supp. at 64-65* (citations omitted); see also *Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 180 (S.D.N.Y. 1995).* Colour & Design alleges that in response to a phone inquiry made by William Belmont, a private investigative attorney working on its behalf, U.S. Vinyl shipped to a New York City address a wallcovering sample book entitled "Suntones II" that included the allegedly infringing patterns. (Declaration of William Belmont, 12/13/04 ("Belmont Decl.") PP1-4) This shipment and offer of the patterns for sale to a New York customer is enough to confer jurisdiction.

Moreover, U.S. Vinyl sells its products primarily to large commercial customers, including hotel chains. (Declaration of Steven McCloud ("McCloud Decl.") P8) It is undisputed that the hotel [\*5] chains to which U.S. Vinyl sells its wall coverings generally have numerous properties in New York. Also, U.S. Vinyl operates a website that provides information, sales contacts, and links to U.S. Vinyl sales representatives. (See Exs. 7-9 to Pl.'s Opp'n) Colour & Design alleges that at the time it filed this lawsuit, the infringing patterns were available to customers -- presumably for viewing or sale -- on the website as part of the "Suntones II Collection" or part of the approved patterns for the Courtyard Inn by Marriott and Residence Inn by Marriott hotel chains. (Declaration of Tommy Abshire ("Abshire Decl.") P11) Since then, the link to the "Suntones II Collection" has been removed. (Id.) However, "many of the, infringing patterns are still advertised and made available on the U.S. Vinyl website as parts of the [hotel] programs." (Id.; Ex. 9 to Pl.'s Opp'n) Finally, the U.S. Vinyl website lists Jerry, Ian, and Peter Fruchtman as its "sales representatives"

for New York. (Ex. 7 to Pl.'s Opp'n); see *Topps Co. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 91 (S.D.N.Y. 1997)* ("even if a non-domiciliary defendant commits infringement through sales [\*6] by independent brokers or retail merchants in New York, this constitutes tortious conduct within New York and subjects the defendant to jurisdiction under *CPLR 302*").

The exercise of personal jurisdiction over defendants in this case does not offend due process. "Ordinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because *CPLR § 302* does not reach as far as the constitution permits." *Topps, 961 F. Supp. at 90.* Here, minimum contacts requirements are satisfied by an actual offer of sale and shipment of infringing products to an entity in New York, the maintenance of an interactive website accessible in New York, and relationships with sales representatives designated to serve customers in New York. See Capitol Records, Inc. v. Kuang Dyi Co. of RM,2004 U.S. Dist. LEXIS 3305, No. 03-520, 2004 WL 405961, at \*2 (S.D.N.Y. Mar. 4, 2004).

"A corporate president who has a financial interest in the company and the ability to supervise or control an infringing activity will be held personally liable." *Editorial, 829 F. Supp. at 66* (citing *Lauratex Textile Corp. v. Allton Knitting Mills, Inc., 517 F. Supp. 900 (S.D.N.Y. 1981)).* [\*7] So long as he can be held personally liable for U.S. Vinyl's acts of infringement and unfair competition as alleged in the complaint, McCloud is subject to personal jurisdiction. Id.; (Compl. PP3, 12 (McCloud "directs and controls the actions of Defendant U.S. Vinyl, and has authorized, controlled, and directed U.S. Vinyl to copy the copyrighted Colour & Design Patters and manufacture, sell and distribute the Infringing Wallcoverings" and "receives pecuniary benefit" from the alleged infringement)).

Accordingly, defendants' motion to dismiss for lack of personal jurisdiction is denied.

IV.

Venue in federal copyright infringement claims is governed by *28 U.S.C. § 1400(a)*, which states that an action "may be instituted in the district in which the defendant or his agent resides or may be found." *Editorial, 829 F. Supp. at 66.* "It is well-established that a defendant 'may be found' in any district in which he is amenable to personal jurisdiction; thus, venue and jurisdiction are coextensive." Id.; Capitol Records, 2004 WL 405961, at \*1. Hence, venue is proper in this district.

"Motions for transfer lie within the broad [\*8] discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *Hall v. South Orange, 89 F. Supp.2d 488, 493 (S.D.N.Y. 2000).* "The inquiry on a motion to transfer is

two-fold." *Orb Factory, Ltd. v. Design Science Toys, Ltd., 6 F. Supp.2d 203, 208 (S.D.N.Y. 1998).* First, it must be determined whether the action sought to be transferred is one that "might have been brought" in the transferee court. *Id.; 28 U.S.C. 1404(a).* The parties do not appear to dispute that the Northern District of Georgia is a district where the action might have been brought.

Second, several factors dealing with the "convenience" of a transfer and the "interest of justice" must be considered to determine whether a transfer is appropriate. *Orb Factory, 6 F. Supp.2d at 208.* The moving party must make "a clear and convincing showing that the balance of convenience favors [its] choice." *Hubbell, Inc. v. Seymour, Inc., 883 F. Supp. 955, 962 (S.D.N.Y. 1995); Lipton v. The Nature Co., 781 F. Supp. 1032, 1035 (S.D.N.Y. 1992)* ("heavy burden" [*9] in a copyright infringement action). The following factors must be considered: (i) convenience of the witnesses and parties; (ii) the locus of operative facts in the case; (iii) the location of relevant documents and access to proof; (iv) the forums' familiarity with the governing law; (v) the availability of process to compel the attendance of unwilling witnesses; (vi) the weight accorded to a plaintiff's choice of forum; and (vii) trial efficiency and the interest of justice generally. See *28 U.S.C. § 1404(a); Orb Factory, 6 F. Supp.2d at 208.*

The convenience of the parties and non-party witnesses is generally considered the most important factor in a motion to transfer venue. See, e.g., *Coker v. Bank of Am., 984 F. Supp. 757, 765 (S.D.N.Y. 1997).* "In order to meets its burden, the motion of the party seeking transfer must specifically list the evidence and witnesses on which the party intends to rely in the transferee district, along with a general statement of the topics of each witness' testimony." *Editorial, 829 F. Supp. at 66-67;* see also *Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 218 (2d Cir. 1978).* [*10]

Defendants have not identified specific witnesses they intend to call, let alone any hardship to those witnesses. Nor has any proposed testimony been specified. Defendants simply and baldly assert that "no witnesses are located in New York" and that "all witnesses are in either Arkansas or Georgia." (Defs.' Mem. of Law at 9) Without more, such assertions are not sufficient to justify a transfer to the Northern District of Georgia. See *Orb Factory, 6 F. Supp.2d at 208-09* ("Vague generalizations and failure to clearly specify key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a change of venue."). Also, defendants have not identified any unwilling witnesses over whom there may be an issue as to availability of process. See, e.g., *GPA, Inc. v. Liggett Group, Inc., 1994 U.S. Dist. LEXIS 14043, No.*

94-5735, 1994 WL 537017, at *2 (S.D.N.Y. Oct. 4, 1994) (declining to find availability of process to compel unwilling witnesses as a factor in favor of transfer where defendant failed to offer evidence that witnesses would be unwilling to travel).

Likewise, defendants' assertion that relevant documents [*11] and sources of proof warrant transfer is accorded little weight without a detailed showing of the burden defendants would incur absent transfer. Their cursory attempt to justify transfer based on the location of documents and evidence does little more than claim that "U.S. Vinyl documents, Steven McCloud and other U.S. Vinyl employees who may have knowledge relevant to this case" are located within defendants' home forum. (Defs.' Mem. of Law at 8); see, e.g., *Intria Corp. v. Intira Corp., 2000 U.S. Dist. LEXIS 17039, No. 00-7198, 2000 WL 1745043, at *4 (Nov. 27, 2000)* (defendant's blanket assertion that all documents relating to the litigation were in defendant's home forum was not enough to favor transfer). Accordingly, given defendants' failure to specify the nature and volume of the documents they plan to use in support of their case, or the difficulty in transporting such documents, this factor weighs against transfer.

None of the remaining factors weigh in defendants' favor. Because this is a federal copyright action, this court and the Northern District of Georgia are presumed to be equally familiar with the governing law. See Capitol Records, 2004 WL 405961, at *4. [*12] As for the locus of operative facts, defendants simply claim that "no relevant activities occurred in New York." (Defs.' Mem. of Law at 9) Colour & Design points to defendants' offer for sale and shipment of samples of the allegedly infringing designs to New York, in response to the inquiry made by Colour & Design's investigator, William Belmont. Moreover, U.S. Vinyl has designated New York sales representatives. Therefore, New York has a sufficient connection to the locus of operative events, and the "center of gravity of the litigation" is not tilted in favor of transfer, especially where defendants' claims are so vague. *Capitol Records, 2004 WL 405961, at *4.*

The convenience of the parties does not favor transfer when it would merely shift any inconvenience from defendant to plaintiff. See *Nabisco, Inc. v. Brach's Confections, Inc., 2000 U.S. Dist. LEXIS 16168, No. 00-5875, 2000 WL 1677935, at *3 (S.D.N.Y. Nov. 8, 2000).* Colour & Design has identified several potential witnesses all of whom reside in or very close to the Southern District of New York. (Pl.'s Opp'n at 20) Although defendants note that their witnesses will include U.S. Vinyl employees located in Georgia, [*13] no further detail is provided. Hence, plaintiff's witnesses would be as much inconvenienced traveling to Georgia as would defendants' witnesses if required to travel to New York.

Accordingly, this factor does not weigh in favor of transfer.

Although "ordinarily plaintiff's choice of forum is given significant weight in a *Section 1404(a)* analysis, where the forum chosen is not the plaintiff's home forum, the choice is given less deference." Foley v. Sammons Preston, Inc., 2004 U.S. Dist. LEXIS 98, No. 03-5485, 2004 WL 35438, at *5 (S.D.N.Y. Jan. 6, 2004) (quoting *Kiss My Face v. Bunting, 2003 U.S. Dist. LEXIS 17096, No. 02-2645, 2003 WL 22244587, at *4 (S.D.N.Y. Sept. 30. 2003)*). However, Colour & Design's ongoing business activities in New York and New York's strong connection to the "locus of operative facts" weigh against transfer. See *Goggins v. Alliance Capital Mgmt., 279 F. Supp.2d 228, 232 (S.D.N.Y. 2003); Virgin Enters. Ltd. v. Am. Longevity, 2001 U.S. Dist. LEXIS 2046, No. 99-9854, 2001 WL 34142402, at *11 (S.D.N.Y. Mar. 1, 2001)*).

Defendants do not argue how trial efficiency or "the interest of justice" would be compromised by litigating in this district.

Defendants have [*14] failed to meet their burden of demonstrating that transfer to the District of Georgia is warranted. Their motion to change venue is denied.

V.

Defendants also move to dismiss Colour & Design's unfair competition claim as preempted by the *Copyright Act*. That Act grants copyright holders the exclusive rights "(1) to reproduce the copyrighted work . . .; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) . . . to perform the copyrighted work publicly; and (5) . . . to display the copyrighted work publicly." *17 U.S.C. § 106*.

"A state cause of action is preempted by federal copyright laws if the subject matter of the state-law claims might fall within the subject matter of the copyright laws and the state-law right asserted is equivalent to the exclusive rights protected by federal copyright law." *Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993); 17 U.S.C. § 301*. However,

> if an "extra element" is "required instead of or in addition to the acts [*15] of reproduction, performance, distribution or display, in order to constitute a state-created cause of action," then the right does not lie 'within the general scope of copyright' and there is no preemption." . . . A state law claim is not preempted if the "extra element" changes the "nature of the

action so that it is qualitatively different from a copyright infringement claim."

*Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992)* (citations omitted and emphasis in original).

Following this "extra element" test, the Second Circuit has held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by federal law. See, e.g., *Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir. 1986); Warner Bros., Inc. v. Am. Broad. Cos., 720 F.2d 231, 247 (2d Cir. 1983); Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 919 & n.15 (2d Cir. 1980)*; see also *Morris v. Buffalo Chips Bootery, Inc., 160 F. Supp.2d 718, 721-22 (S.D.N.Y. 2001)*. However, the Court has held also that [*16] state law unfair competition claims that allege the tort of "passing off" one's goods as those of another or creating confusion as to the source of goods are not preempted because they do not entail the assertion of rights equivalent to those protected by federal copyright law. See *Lone Wolf McQuade Assocs. v. CBS, 961 F. Supp. 587, 598-99 (S.D.N.Y. 1997)* (citing *Warner Bros., 720 F.2d at 247* (citing *Nimmer on Copyright §§ 1.01[B][1] n. 47, 2.12 n. 25 (1983)*)). Put another way, "confusion as to source" constitutes an "extra element." *Samara Bros., Inc. v. Wal-Mart Stores, Inc., 165 F.3d 120, 131-32 (2d Cir. 1998)*.

Whether Colour & Design's unfair competition claim is preempted depends on the nature of the claim. "Claims for unfair competition in New York have traditionally involved passing off or malicious or fraudulent interference with good will." *Fun-Damental Too v. Gemmy Indus. Corp., 1996 U.S. Dist. LEXIS 18653, No. 96-1103, 1996 WL 724734, at *2 (S.D.N.Y. Dec. 17, 1996)* (quoting *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co., 614 F.2d 832, 842 (2d Cir. 1980)*). [*17] There are two types of passing off claims. "In reverse passing off, the wrongdoer sells plaintiff's products as its own. It contrasts with passing off, where the wrongdoer sells its products as the plaintiff's." Id. (quoting *Waldman Publ'g Corp. v. Landoll, Inc., 848 F. Supp. 498, 500-01 (S.D.N.Y.)*, vacated in part on other grounds, *43 F.3d 775 (2d Cir. 1994)*). Unfair competition claims alleging the former are preempted because they are "equivalent to a claim for copyright infringement." See, e.g., *Am. Movie Classics Co. v. Turner Entm't Co., 922 F. Supp. 926, 934 (S.D.N.Y. 1996)* (citing *Waldman, 848 F. Supp. at 505*).

Colour & Design contends that its unfair competition claim is based on confusion as to source and that because "customer confusion" constitutes an "extra element," the claim is not preempted by the *Copyright Act*. See *Am. Footwear Corp. v. Gen. Footwear Corp., 609*

2005 U.S. Dist. LEXIS 10964, *

*F.2d 655, 664 (2d Cir. 1979)* (to succeed on unfair competition claim, plaintiff must show likelihood of confusion or deception of the consuming public as to source). In its complaint, Colour & Design alleges: [*18]

> By reason of the foregoing conduct and acts, Defendants . . . have been and are engaging in unfair competition with Plaintiff by copying, publishing, displaying, vending, distributing, selling, utilizing, promoting and otherwise commercially benefiting from wallcoverings and designs which are likely to deceive and confuse the public into believing that Defendants' Infringing Wallcoverings and designs are Plaintiff's Copyrighted Deigns or are sponsored by, licensed by, endorsed by or are otherwise associated with Plaintiff and by misappropriating or attempting to misappropriate the copyrighted [] Designs and Plaintiffs goodwill and reputation which are associated therewith.

(Compl. P20) In other words, Colour & Design's unfair competition claim is one of passing off. It alleges that U.S. Vinyl's product is similar enough to its own to confuse consumers and lead them to believe that U.S. Vinyl's patterns are Colour & Design's. Confusion between the two sets of designs constitutes an "extra element" that insulates the unfair competition claim from preemption. Accordingly, defendants' motion to dismiss Colour & Design's unfair competition claim is denied.

* * *

For [*19] the reasons set forth above, defendants' motions are denied.

SO ORDERED:

Dated: New York, New York

May 19, 2005

Michael B. Mukasey

U.S. District Judge

# EXHIBIT 3

LEXSEE 2001 U.S. DIST. LEXIS 14753

**NETTECH SOLUTIONS, L.L.C. and ePARK, L.L.C., Plaintiffs, - against - ZIP-PARK.COM, FEDERAL APD, INC., B.E.A.C., L.L.C., CONTROL SYSTEMS, INC., and BARRY G. LAZOWSKI, Defendants.**

**01 Civ. 2683 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 14753*

**September 20, 2001, Decided**
**September 20, 2001, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment with respect to the contract claims and to the claims asserted against Lazowski in his individual capacity denied. Plaintiffs' claim for unfair competition based on the copying of Valet 2000 preempted and dismissed.

**COUNSEL:** For NetTech Solution, L.L.C. and ePark, L.L.C.: Eric Lee, Esq., Atlas Pearlman, P.A., Fort Lauderdale, FL.

For NetTech Solution, L.L.C. and ePark, L.L.C.: Mark A. Berman, Esq., Gafner & Shore, New York, NY.

For B.E.A.C., L.L.C., Control Systems, Inc., Barry Lazowski and ZipPark.com: Charles E. Knapp, Esq., Law Offices of Charles E. Knapp, P.C., New York, NY.

For Federal APD, Inc.: Brendan O'Rourke, Esq., Proskauer Rose LLP, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

*OPINION AND ORDER*

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Plaintiffs, NetTech Solutions, L.L.C. ("NetTech") and ePark, L.L.C. ("ePark"), are suing B.E.A.C., L.L.C. ("BEAC"), Control Systems, Inc. ("Control"), Barry Lazowski, ZipPark.com, and Federal APD, Inc. ("Federal"), for copyright infringement of NetTech's Valet 2000 System Software and accompanying documentation ("Valet 2000"). Plaintiffs also assert [*2] common law claims of unfair competition and breach of contract. BEAC, Control, Lazowski and ZipPark.com (collectively the "moving defendants") [1] now seek summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. [2] For the reasons stated below, the moving defendants' motion is denied in part and granted in part.

1    Federal, a manufacturer of parking revenue control equipment that has had a business relationship with Control dating back to 1988, *see* Affidavit of Barry Lazowski in Support of Defendants' Motion for Summary Judgment ("Lazowski Aff.") P 6, does not join its co-defendants in moving for summary judgment at this time.

2    The moving defendants do not seek summary judgment with respect to plaintiffs' copyright claim. Due to its highly technical nature, plaintiffs' copyright claim is being addressed separately, by agreement between the parties, through a Court appointed Special Master. *See* 8/3/01 Order. The parties were directed to provide the Special Master with their pleadings as well as the software and/or documentation relevant to this claim. *See id.* After a review of these materials, the Special Master will prepare a report summarizing his findings and conclusions for the Court. *See id.* As of the date of this Opinion and Order, no report has been filed.

[*3] **I. LEGAL STANDARD**

*Rule 56* provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Hous. Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001)* (quotation marks and citations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. General Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001)*.

## II. BACKGROUND

### A. NetTech, BEAC, Control and Lazowski

Founded in 1996, NetTech provides information processing services and database management systems to customers nationwide. *See* Affidavit of Seth Daley, [*4] President of NetTech and President and Manager of ePark, in Opposition to Defendants' Motion for Summary Judgment ("Daley Aff.") P 4.

In 1988, Lazowski founded Control, a company whose business concerns parking access and revenue control in the parking garage industry. *See* Lazowski Aff. PP 4, 6. Lazowski is the company's President and sole shareholder. *See* 8/23/00 Deposition of Barry Lazowski ("Lazowski Dep."), attached as Ex. C to the Affirmation of Charles Knapp, counsel for the moving defendants ("Knapp Aff."), at 7. Lazowski is also the President of BEAC, an investment vehicle with no employees. *See* Lazowski Aff. P 4. BEAC's limited liability members are Lazowski, his wife, and his two daughters. *See* Lazowski Dep. at 9.

### B. The Relationship of the Principal Parties

In July 1997, Control asked NetTech to create valet-related software for New York Hospital, one of Control's customers. *See* Defendants' Statement of Facts Pursuant to Local Rule 56.1 ("Defs. 56.1") P 6. At the time, Net-Tech had no previous experience with the valet parking industry. *See* Plaintiffs' Statement of Facts Pursuant to Local Rule 56.1 ("Pls. 56.1") P 6. After NetTech completed [*5] the job, Control and NetTech began to discuss creating software that could be used by garages throughout New York. *See* Defs. 56. *1 P 11*; 6/14/01 Deposition of John Coyle, Vice-President of NetTech, attached as Ex. D. to Knapp Aff., at 23-25. With input from Lazowski, NetTech developed the product, which was initially called the Valet Automated Management System ("VAMS"). *See* Pls. 56. *1 P 9*; Daley Aff. PP 5,

8, 10. NetTech then created a website for Control to display VAMS. *See* Defs. 56. *1 P 12*.

NetTech further developed VAMS, using information gleaned from conversations with Lazowski. *See* Daley Aff. P 10. The product eventually became known as Valet 2000 and is a computer system for valet and self-park facilities that provides comprehensive revenue management, automated financial reporting, and secure, accurate transactions. *See id.* P 5, 6. Valet 2000's source code and software were developed by NetTech's programmer, Miguel Gonzalez. *See* Pls. 56. *1 P 17*. On or about August 7, 1998, NetTech registered Valet 2000 with the United States Copyright Office. *See* Daley Aff. P 11.

### 1. The ePark Agreement

During [*6] the development of Valet 2000, Net-Tech and Lazowski, acting on behalf of Control, discussed a business arrangement that would maximize the marketing and sale of licenses to use the product. *See id.* P 8. As a result, on March 25, 1999, the parties created ePark, a limited liability company, with NetTech holding 51% of ePark's shares, and BEAC -- which Lazowski created for purposes of this joint venture -- holding the remaining 49% (the "ePark Agreement"). *See* Defs. 56.1; ePark Agreement, attached as Ex. 1 to Daley Aff., § 2.1.

#### a. The Duties of the Parties

NetTech's duties under the ePark Agreement included: (1) maintaining a sufficient level of inventory of Valet 2000; (2) providing future updates and upgrades of Valet 2000; (3) providing reasonable software support and maintenance, as well as training for Control's employees; and (4) warranting the software. *See* ePark Agreement § 2.2. BEAC's duties included: (1) using its best efforts to market and sell the product on a local and national level; (2) providing a professional sales plan; (3) arranging a third-party hardware integrator/installer for Valet 2000; and (4) providing customer support for Valet 2000. [*7] *See id.* § 2.3. On the same day the parties executed the ePark Agreement, BEAC entered into a separate Service Agreement with Control to provide the services required under the ePark Agreement. *See* Defs. 56. *1 P 15*; Lazowski Dep. P 30; Service Agreement, attached as Ex. A to Reply Affidavit of Barry Lazowski ("Lazowski Reply Aff."), § 1. Lazowski executed the Service Agreement as President of both BEAC and Control. *See* Service Agreement at 6.

#### b. The Rights Associated with the Valet 2000 and the Confidentiality Provisions of the ePark Agreement

Pursuant to Article III of the ePark Agreement, BEAC, Control and ePark each agreed that NetTech

2001 U.S. Dist. LEXIS 14753, *

owned all intellectual property rights associated with Valet 2000. *See* ePark Agreement §§ 3.1, 3.2. BEAC and Control further agreed not to alter, modify, change, decompile, disassemble or reverse engineer the Valet 2000 software or try to discover or disclose NetTech's trade secrets by disassembling, recompiling or otherwise reverse engineering the Valet 2000 software. *See id.* § 3.2. Control also agreed to keep all trade secrets and proprietary information relating to Valet 2000 confidential. *See id.* § [*8]  3.3. In addition, during the life of the ePark Agreement,

> NetTech, ePark, B.E.A.C. and Control agreed not to collaborate with a competitor of any of the parties to develop, market or assist in the development/marketing of, a software product directly competitive with the [Valet 2000]. In the event that B.E.A.C., Control, or NetTech developed a concept for a related software product, the party that presents the concept for said product [was obligated to] first offer the product concept to ePark. In the event that ePark declined to pursue the development of the product, the party that presented said product, being either Control, B.E.A.C., or NetTech [was] free to offer the product idea to a third party.

*Id.* § 3.5.

## 2. The Relationship Sours

Although the parties dispute why their relationship soured, plaintiffs contend that BEAC and Control failed to provide adequate sales and support services as required under the ePark Agreement. *See* Daley Aff. P 14. As a result, NetTech decided its best option was to immediately terminate their business relationship. *See id.* P 15.

### a. The Correspondence

In a letter dated February 16, 2000, Seth [*9] Daley, NetTech's President, offered Lazowski two options:

> 1 . Purchase the Valet 2000 and Valet 2000 Remote software from NetTech at a price of $ 500,000. The price in [sic] non-negotiable and payable in a lump sum. [or]

> 2. NetTech and BEAC will dissolve ePark and each go our separate ways. Kindly bare [sic] in mind that there is sig-

nificant liability in supporting the existing Valet 2000 customers.

2/16/00 Letter from Daley to Lazowski, attached as Ex. A to Lazowski Aff. Lazowski responded to Daley that, before Control could reply to Daley's offer to sell Valet 2000, the company would need to inspect the software. *See* 2/25/00 Letter from Lazowski to Daley, attached as Ex. C to Lazowski Aff. With respect to option two -- the dissolution of ePark -- Lazowski stated that if they failed to reach an agreement to sell Valet 2000, they would later discuss the details of ePark's dissolution. *See id.*

Daley then notified Lazowski that an independent software consultant could review the software after the proper non-disclosure and non-compete clauses were signed. *See* 2/28/00 Letter from Daley to Lazowski, attached as Ex. D to Lazowski Aff. In addition, Daley [*10] again offered Lazowski the dissolution option, this time stating that

> NetTech will dissolve ePark and not pursue any legal action against Control Systems or BEAC, LLC, for breach of contract. NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients.

*Id.* The tone of Daley's letter and the parties' business relationship in general upset Lazowski, *see* Lazowski Aff. P 41, who responded by stating:

> Given my lack of faith in you [Daley], it is apparent that even having the software analyzed is a waste of time since you are not truly interested in selling it at any fair price. Since ePark is doomed to deadlock, I am forced to conclude that the most efficient way to proceed is to accept your second option: (a) ePark is dissolved (that is to say that its affairs are wound down, no new business is taken on, its assets marshalled, its creditors and taxes paid and the remaining assets are distributed to the shareholders) and (b) NetTech provides both Control Systems Inc. and BEAC, LLC with general releases and indemnifications.

3/1/00 Letter from Lazowski to Daley, attached as Ex. E to Lazowski [*11] Aff.

The next day Daley sent Lazowski a letter proposing terms for ePark's dissolution and requesting that Lazowski sign and date the letter if he agreed. *See* 3/2/00 Letter from Daley to Lazowski, attached as Ex. E to Lazowski Aff. Lazowski did not sign the letter and instead insisted that Daley provide Control and BEAC with an executed general release and indemnification prior to ePark's dissolution. *See* 3/3/00 Letter from Lazowski to Daley, attached as Ex. 6 to Daley Aff. In response, Daley faxed a letter to Lazowski stating that

> after conferring with two corporate attorneys . . . it has been determined that there is no need for, nor will there be provided any indemnification of B.E.A.C., L.L.C. or Control Systems, Inc. by Net-Tech Solutions, L.L.C. Pursuant to L.L.C. guidelines, each member of an L.L.C. is liable only for the total amount of capital contributions to the L.L.C. In B.E.A.C., L.L.C.'s case, the total liability is $ 4.90. The liability of $ 4.90 expires one year from the date of filing the Delaware certificate of dissolution. There should be no further discussion about indemnification.

3/3/00 Letter from Daley to Lazowski, attached as Ex. 7 to [*12] Daley Aff. Lazowski responded a few days later contending that

> the issue of the release and indemnification was part of your [Daley's] February 28 proposal, which you referred to as Option 2 to resolve this matter. You may wish to refresh your memory on this point. In any event, we accepted your proposal and fully expect you to live up to your end of the bargain.

3/6/00 Letter from Lazowski to Daley, attached as Ex. 8 to Daley Aff. That same day, Daley wrote to Lazowksi that

> with regards to [the] letter dated February 28, 2000, I stated in Option 2 that "NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients." This statement is quite clear. NetTech will release B.E.A.C.[,] L.L.C. from supporting the product. The statement does not say anything about indemnification.

3/6/00 Letter from Daley to Lazowski, attached as Ex. 9 to Daley Aff. Lazowski responded by again reiterating his position that option two, as set forth in the February 28 letter, included the provision of a general release and indemnification to both Control and BEAC prior to ePark's dissolution. *See* 3/7/00 Letter [*13] from Lazowski to Daley, attached as Ex. 10 to Daley Aff.

In an effort to clarify any misunderstanding, Daley set forth what NetTech would do in consideration for BEAC and Control's agreement to dissolve ePark:

> 1. "NetTech will dissolve ePark and not pursue any legal action against Control Systems or BEAC, LLC, for breach of contract." [3] *This means that NetTech will not commence legal action against B.E.A.C., L.L.C. or Control Systems, Inc. for breach of the ePark, L.L.C. contract/agreement.* This does not mean that NetTech Solutions, L.L.C. intends to indemnify any of the parties nor will Net-Tech Solutions, L.L.C. do so.

> 2. "NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients." *This means that NetTech Solutions, L.L.C. is going to continue to support the product and maintain a help desk, which NetTech has been doing all along.* Instead of a customer calling Control Systems and getting either; [sic] no return phone call, inadequate help, or being just told to call NetTech Solutions, the customer will be calling NetTech Solutions directly.

> Barry [Lazowski], there is no attempt by me to "get [*14] out of" any commitment. We are just ending the ePark, L.L.C. corporation. The ePark, L.L.C. operating agreement and the established guidelines for a L.L.C. restrict the amount of liability of B.E.A.C., L.L.C. to $ 4.90. I cannot help but wonder why you keep insisting [on] indemnification when it is not warranted and not stipulated in any of ePark, L.L.C.'s operating agreements.

3/7/00 Letter from Daley to Lazowski, attached as Ex. F to Lazowski Aff. (emphasis in original). Although he dropped his request for indemnification, Lazowski wrote to Daley the next day again insisting on a general release, stating that ePark's dissolution could proceed the moment such a release was executed. *See* 3/8/00 Letter from La-

zowski to Daley, attached as Ex. F to Lakowski Aff. Daley responded that a release was "not warranted" and "would not be provided." 3/9/00 Letter from Daley to Lazowski, attached as Ex. 11 to Daley Aff. At this point, Lazowski abandoned his request for a release and "decided to trust Daley to live up to his agreement of a general waiver, based on his clear statement in his correspondence." Lazowski Reply Aff. P 20. Lazowski and Daley ceased any discussion of a release [*15] or indemnification, and NetTech began the dissolution process.

3    The quoted language was taken from Daley's February 28, 2000 letter.

By mid-March, NetTech began advising ePark's customers that NetTech no longer had a business arrangement with Control. *See* Pls. 56. 1 *P 23*. NetTech began servicing ePark's customers directly and billing them for its services. *See id. P 24*. On April 28, 2000, Daley sent Lazowski a letter enclosing a copy of the dissolution letter that had been mailed to the Delaware Secretary of State and informed him that ePark was officially dissolved as of that date. *See* 4/28/00 Letter from Daley to Lazowski, attached as Ex. H to Lazowski Aff.

At a trade show in Florida a few weeks later, Net-Tech discovered that Lazowski was exhibiting a concept for another parking related product -- ZipPark, *see* Daley Aff. PP 40, 41, which NetTech alleges infringes upon the Valet 2000. Soon after the trade show, ePark's dissolution papers were returned by the Delaware [*16] Secretary of State because of a technical deficiency. *See id PP 42, 43*. NetTech decided not to correct the deficiency in the dissolution papers and ePark was never formally dissolved. *See id. P 43*.

### III. DISCUSSION [4]

4    All parties appear to agree that New York law governs plaintiffs' common law claims.

The moving defendants seek summary judgment on four grounds. *First*, in consideration for BEAC and Control's agreement to dissolve ePark, plaintiffs waived any claims against them for breach of the ePark Agreement. [5] *Second*, plaintiffs' federal copyright claim preempts their unfair competition claims. *Third*, plaintiffs' claims are factually baseless. *Fourth*, plaintiffs' claims against Lazowski in his individual capacity must be dismissed because there are no facts warranting the piercing of the corporate veil. Each argument is addressed below.

5    Waiver is an affirmative defense. *See Fed. R. Civ. P. 8(c)*. Generally, affirmative defenses are considered to have been waived unless defendants plead them in their answer. *See Refore-*

*stacion Cafetalera Agro-Industrial S.A. v. Campesino Food Corp., 1999 U.S. Dist. LEXIS 11*, No. 97 Civ. 5553, 1999 WL 4964, at *3 (S.D.N.Y. Jan. 6, 1999). In this case, although the moving defendants did not explicitly plead waiver as a defense, they did assert the related defense of estoppel. Specifically, they asserted that plaintiffs'

> action is barred by estoppel, as plaintiffs, in consideration for BEAC's agreement to dissolve ePark . . . agreed that they would not "commence legal action against [BEAC or Control] for breach of the ePark, L.L.C. contract/agreement."

Answer of Moving Defendants, Third Affirmative Defense. Plaintiffs were put on notice of a possible waiver defense and fully briefed the waiver issue without objection. The Court will therefore treat the defense as timely raised. *See Mooney v. City of New York, 219 F.3d 123, 127 n.2 (2d Cir. 2000)* (holding that the waiver defense had not been waived where plaintiff responded to the defense without objection); *Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A., 1998 U.S. Dist. LEXIS 7489, *63 n.11, No. 94 Civ. 5835, 1998 WL 259928, at *23 n.11 (S.D.N.Y. May 21, 1998)*, *rev'd on other grounds*, *176 F.3d 601 (2d Cir. 1999)* (stating that because defendant "fully briefed [the waiver] issue[] in its opposition to the plaintiff's motion for partial summary judgment", the court would treat the defense as timely raised).

### [*17] A. Waiver

Plaintiffs allege that BEAC and Control breached the provisions set forth in Article III of the ePark Agreement by (1) misappropriating confidential information; (2) collaborating with competitors to develop a competing product to the Valet 2000; and (3) failing to present any software it developed to ePark. *See* Complaint ("Compl.") PP 84-86. The moving defendants argue that plaintiffs' correspondence and actions establish plaintiffs' waiver of these claims in consideration for BEAC and Control's agreement to dissolve ePark. Plaintiffs disagree and further argue that, even assuming there was a waiver, it only covered claims for breaches concerning BEAC and Control's failure to market, sell, support and service the Valet 2000 -- claims not asserted in this action.

2001 U.S. Dist. LEXIS 14753, *

### 1. Standard

"A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." *Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37, 118 N.E. 210 (1917); see also Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 685 (2d Cir. 1983)*. Waiver [*18] is "essentially a matter of intention", *see Alsens, 222 N.Y. at 37*, and is thus most commonly "proved through declarations, acts and nonfeasance which permit different inferences to be drawn and 'do not directly, unmistakably or unequivocally establish it.'" *Voest-Alpine, 707 F.2d at 685* (quoting *Alsens, 222 N.Y. at 37*). In these instances the trier of fact must determine intent. *See Alsens, 222 N.Y. at 37; see also In re Caldor, Inc., 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998)* (waiver is "generally ill-suited for summary adjudication"); *Edrei v. Copenhagen Handelsbank A/S, 1991 U.S. Dist. LEXIS 5369, *34-35, No. 90 Civ. 1860, 1991 WL 64201, at *11 (S.D.N.Y. Apr. 19, 1991)* ("It is long established that, under New York law, the question of waiver is one of fact."). Occasionally, a waiver may be established as a matter of law by the express declaration of a party or in situations "where the party's undisputed acts or language are 'so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary.'" *Voest-Alpine, 707 F.2d at 685* (quoting *Alsens, 222 N.Y. at 37*). [*19]

### 2. Analysis

While the correspondence clearly shows that the plaintiffs, in an effort to dissolve ePark, relieved BEAC and Control from any obligations and liability associated with the marketing, selling, service and support for the Valet 2000, nowhere in the correspondence is there an express agreement releasing them from their duty to keep information relating to the Valet 2000 confidential, or their duty to refrain from developing a competing product during the life of the ePark Agreement. In response to Daley's February 28 and March 7 letters and throughout the course of the correspondence, Lazowski, on behalf of BEAC and Control, continuously insisted on the execution of a general release and indemnification prior to the dissolution of ePark. Each time Daley refused to provide these documents. The final request for a release came in a letter dated March 8, 2000, in which Lazowski stated

dissolution may proceed the moment you [Daley] present us [BEAC and Control] with the executed documents you had promised -- although, as I mentioned above, we will insist only on the general

release. We leave the indemnification to your own conscience.

3/8/00 Letter, [*20] attached as Ex. F to Lazowski Aff. The next day Daley responded by stating that

the words "indemnification" and "release" do not appear in Option 2 of my letter dated February 28, 2000. Your request for these two items [is] not warranted and they will not be provided. This is the last time I will address this issue.

*All liability for support ends with the dissolution of ePark, L.L.C.* Kindly refrain from further insistence on any type of indemnification and/or release.

With this issue now resolved, we shall proceed with the dissolution.

3/9/00 Letter, attached as Ex. F to Lazowski Aff. (emphasis added). Lazowski did not object to this letter and ePark's dissolution went forward, without either a release or indemnification.

"The acts and language of [a] party must be given . . . their natural and logical effect under the circumstances of [a particular] case." *Alsens, 222 N.Y. at 37-38*. Further,

where the rights and liabilities of parties depend on contracts, and a variety of transactions and dealings arising therefrom, or where the facts are contradictory and complicated, it is a question for the jury to determine: How far [*21] parties have waived any of their legal rights? In all questions of this sort so much depends on the intent with which parties act that it would be impossible for courts to establish any certain rule by which all cases could be governed. They must necessarily be left to the determination of juries, whose peculiar province it is to ascertain the intent of parties as gathered from the various facts and circumstances proved in each particular case. And such we understand to be the doctrine recognized and established by judicial decisions.

*Id.* (quoting *Fox v. Harding, 61 Mass. 516, 521, 1851 WL 3313, at *4 (Mass. 1851)*. In drafting the ePark

2001 U.S. Dist. LEXIS 14753, *

Agreement, NetTech carefully included provisions designed to protect any confidential and proprietary information relating to Valet 2000 and to ensure that Control and BEAC did not help develop a competing product during the life of the ePark Agreement. *See* ePark Agreement §§ 3.1-3.3, 3.5. Daley continuously rejected Lazowski's requests for a release and indemnification and repeatedly referred to ending BEAC and Control's "liability for support" in return for their agreement to dissolve ePark. Although Daley stated that NetTech would not [*22] commence legal action for breach of contract against BEAC and Control if there was an agreement to dissolve ePark, in light of the surrounding circumstances, this statement is subject to differing inferences and does not unequivocally establish plaintiffs' intentional relinquishment of their right to seek relief for defendants' alleged violations of the provisions set forth in Article III of the ePark Agreement.

In addition, "without evidence to the contrary, [a] waiver must be interpreted to encompass only those future claims the parties could have reasonably expected might be brought against each other at the time it was agreed upon." *In re Seaman Furniture Co., Inc. v. Seaman Mitchell Assocs., 1996 U.S. Dist. LEXIS 19175*, No. 96 Civ. 4268, 1996 WL 741604, at *5 (S.D.N.Y. Dec. 27, 1996). According to Daley, at the time NetTech agreed not to bring claims against BEAC and Control for violations of the ePark Agreement, NetTech

> had no knowledge that [the moving] Defendants were in the process of misappropriating trade secrets, designing a competing product, having discussions with [Federal] for the distribution and sale of the competing product, and otherwise directly violating the [*23] restrictive covenants of the ePark Agreement.
>
> Had Plaintiffs known of Defendants' activities, Plaintiffs would not have agreed to dissolve ePark and would have brought an action for violating the ePark Agreement[.]

Daley Aff. PP 38, 39. Because a question of fact remains regarding plaintiffs' alleged waiver of the contract claims asserted, the motion for summary judgment on grounds of waiver is denied.

## B. Preemption of Plaintiffs' Unfair Competition Claims

Plaintiffs' second and third causes of action allege claims of unfair competition. *See* Compl. PP 51-77. [6] The

moving defendants argue that plaintiffs' claims of unfair competition are preempted by their federal copyright claim and therefore must be dismissed. The moving defendants are partially correct.

> 6 Plaintiffs second and third causes of action are labeled "False Designation of Origin and Unfair Competition" and "Unfair Trade Practices - Unfair Competition".

The essence of an unfair competition claim under New York law is that [*24] "the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *SGC Communication Res., LLC v. The Seminar Center, Inc., 2001 U.S. Dist. LEXIS 2862*, *22, No. 98 Civ. 2724, 2001 WL 274053, at *8 (S.D.N.Y. Mar. 20, 2001) (quotation marks omitted). The law of unfair competition is "broad and encompasses claims involving the misappropriation of a plaintiff's creative efforts as well as claims for false designation of origin." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 155 F. Supp. 2d 1 2001 U.S. Dist. LEXIS 11568*, *62, 2001 WL 901242, at *16 (S.D.N.Y. 2001).

The federal copyright laws preempt state law claims of unfair competition if the claims are based on the copying of a plaintiff's protected expression. *See Kregos v. Assoc. Press, 3 F.3d 656, 666 (2d Cir. 1993)*; *Warner Bros. Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 246 (2d Cir. 1986)*; *Davis v. Trojer, 2001 U.S. Dist. LEXIS 10193*, No. 99 Civ. 11056, 2001 WL 829872, at *3 (S.D.N.Y. July 20, 2001). However, unfair competition claims that allege a false [*25] designation of origin or confusion as to source are not preempted because these claims require actual confusion -- an "extra element" beyond what is needed to prove a federal copyright violation. *See Samara Bros., Inc. v. Wal-Mart Stores, 165 F.3d 120, 131-32 (2d Cir.), rev'd on other grounds, 529 U.S. 205, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000)*; *see also Twentieth Century Fox*, 2001 WL 901242, at *16 (noting that claims of false designation of origin do not assert rights equivalent to those protected by copyright and generally are not preempted); *Lone Wolf McQuade Assocs. v. CBS Inc., 961 F. Supp. 587, 598-99 (S.D.N.Y. 1997)* (same).

Plaintiffs have alleged an unfair competition claim based on false designation of origin or confusion as to source. *See* Compl. P 60 ("Defendants' sales, advertising, and marketing campaign caused, and continue to cause, a likelihood of confusion as to the source of the product Defendants sell."), and P 63 ("Defendants' product is clearly calculated to deceive and mislead the purchasers and consumers of plaintiffs' product and actually has deceived and mislead [sic] and continues [*26] to de-

ceive and mislead consumers and causes them to buy Defendants' product."). Thus, plaintiffs' claim of unfair competition based on false designation of origin or confusion as to source is not preempted. However, to the extent that plaintiffs' unfair competition claim is based on the copying of Valet 2000, such claim is preempted and therefore dismissed.

## C. The Underlying Facts Supporting Plaintiffs' Claims

The moving defendants also argue that plaintiffs' claims premised on the copying of Valet 2000 software and misappropriation of confidential information and trade secrets must fail because they lack a factual basis. Specifically, the moving defendants assert that according to the March 1, 2001 Affidavit of NetTech's computer programmer, Miguel Gonzalez, (1) NetTech developed Valet 2000 software based on specifications and design parameters provided by Lazowski and Control, *see* 3/1/01 Affidavit of Miguel Gonzalez, attached as Ex. A to Knapp Aff., P 5; (2) no one outside NetTech had access to the Valet 2000 source code, *see id. PP 6, 9, 10*; (3) the Valet 2000's source code is impossible to reverse engineer, *see id. P 7*; and the demonstration program provided [*27] to Lazowksi could not be accessed because it contained an encryption key. *See id. P 10*.

Plaintiffs, in turn, assert that pursuant to *Rule 56(f) of the Federal Rules of Civil Procedure*, they are entitled to further discovery in order to respond fully to the moving defendants' motion and to prove their claims. In addition, plaintiffs direct the Court's attention to a second affidavit of Miguel Gonzalez, in which he contradicts his previous affidavit and states that (1) although the source code was never provided to Lazowski, a fully functional Valet 2000 was provided to Lazowski who had the ability to "copy the executable version of the software, determine the functionality of the software, and otherwise create a product that is based on the Valet 2000 program", *see* 4/1/01 Affidavit of Miguel Gonzalez, attached as Ex. B to Affirmation of Eric Lee, counsel for the plaintiffs ("Lee Aff. I"), PP 6-8; (2) Valet 2000 could be recreated by Lazowski through the use of different programming languages utilizing the processes created for the product, *see id. P 11*; and (3) the ZipPark software appears to function in the same manner as the Valet 2000 and is clearly designed to compete [*28] directly with the Valet 2000 in the marketplace. *See id. PP 14, 16*.

It is well-settled that "a party may not . . . create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine Inc., 925 F.2d 566, 572 (2d Cir. 1991)*. Indeed, "if a party . . . could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish

the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)*. Thus, Gonzalez's second affidavit, by itself, cannot be used to create a genuine issue of material fact. However, plaintiffs credibly assert that additional discovery may be necessary to prove their claims.

To withstand a motion for summary judgment on the grounds that additional discovery is necessary, the party opposing summary judgment "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material [*29] fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999)* (quotation marks omitted); *see also John Street Leasehold v. Capital Mgmt. Res., 154 F. Supp. 2d 527, 2001 U.S. Dist. LEXIS 3643, *59, 2001 WL 310629, at *19 (S.D.N.Y. 2001)*. Plaintiffs' counsel, Eric Lee, has submitted an affidavit satisfying these requirements. *See* Affidavit of Eric Lee ("Lee Aff. II"), attached as Ex. B to Lee Aff. I.

Plaintiffs assert that they have been repeatedly denied discovery by the moving defendants and are entitled to:

(a) communications between the moving defendants and Federal relating to ZipPark.com;

(b) communications between the moving defendants and Advanced Technical Support, Inc. ("ATS") (a software company involved in the creation of the ZipPark product) relating to ZipPark.com and its product;

(c) invoices, purchase orders, and other documents relating to services provided by ATS to moving defendants relating to the ZipPark.com product;

(d) all software programs being created and offered for sale by the moving defendants;

(e) all documents relating to [*30] manuals, marketing and promotional materials concerning the ZipPark.com product;

(f) agreements on contracts between moving defendants and ATS;

(g) all information relating to potential customers or clients obtained by the

moving defendants at the trade show in Florida;

(h) all documents and information utilized by the moving defendants to market, sell or promote the ZipPark.com products;

(i) documents reflecting the names of all employees of the moving defendants;

(j) all documents relating to the advertising of the ZipPark.com products; and

(k) information relating to when the ZipPark.com name was purchased and when ZipPark.com was incorporated or established.

*See* Lee Aff. II P 18. Plaintiffs assert that all of this information is relevant to proving that the moving defendants misappropriated confidential and proprietary information relating to Valet 2000 and helped develop a competing product. *See id. P 19*. Plaintiffs also assert that Magistrate Judge Kevin Fox ordered much of this information to be produced, however, there is no written Order or transcript citation memorializing the purported discovery Order. [7] As such, the parties are directed to contact [*31] Magistrate Judge Fox and schedule a conference to address any remaining discovery disputes and determine what discovery, if any, plaintiffs are entitled to receive from defendants. [8]

7  On July 18, 2001, this Court referred the parties to Magistrate Judge Fox for resolution of their discovery disputes.

8  In turn, the moving defendants have requested (1) a stay of all discovery pending the resolution of this motion and the copyright issues; and (2) an order requiring plaintiffs to divulge the extent of their pre-filing factual inquiry under Rule 11. Both of these requests are denied.

Moreover, the issue at the heart of this action is whether defendants have infringed the copyright of Valet 2000. Because the Special Master's determination as to the infringement issue will necessarily address issues associated with plaintiffs' contract claims, it is prudent to refrain from deciding the sufficiency of plaintiffs' claims until the Court receives the Special Master's report.

**D. The Claims Against Lazowski** [*32]  **in his Individual Capacity**

The moving defendants further argue that plaintiffs' claims against Lazowski in his individual capacity must be dismissed. Plaintiffs assert that numerous factual issues exist regarding the relationship between Lazowski, BEAC, Control and ZipPark.com that preclude the dismissal of these claims.

**1. The Contract Claims**

Under New York law, the corporate veil may be pierced if a corporation is essentially an alter ego of a family or individual. *See Statharos v. New York City, Taxi & Limousine Comm'n, 198 F.3d 317, 324 (2d Cir. 1999).* In order to pierce the corporate veil on a claim for breach of contract, a plaintiff must show (1) the complete domination of the corporation with respect to the transaction at issue, and (2) that such domination was used to commit a fraud or wrong against the aggrieved party. *See Cary Oil v. MG Refining and Mktg., Inc., 90 F. Supp. 2d 401, 415 (S.D.N.Y. 2000).*

The facts suggest that Lazowski exercised complete dominion and control over all matters concerning BEAC. Lazowski testified that BEAC is a limited liability company "set up as an investment vehicle for profits [derived] from [*33] ePark." Lazowski Dep. at 9. BEAC's sole purpose is to make investments and its limited liability members include Lazowski, his wife, and his two daughters. *See id. at 9-10.* BEAC has no employees and is currently involved in no financial investments or businesses other than its business with ePark. *See id.*

Furthermore, all of NetTech's dealings with BEAC were through Lazowski. If BEAC did breach the ePark Agreement by misappropriating confidential and proprietary information relating to Valet 2000 and helping develop a competing product, there can be little doubt that Lazowski used his control over BEAC to commit such wrongdoing. Accordingly, the moving defendants' motion to dismiss the breach of contract claims against Lazowski in his individual capacity is denied. [9]

9  As a separate matter, the moving defendants also appear to argue that Control, a non-signatory to the ePark Agreement, cannot be held liable for the breach of contract claims asserted in this action. While it is well-settled that generally a contract cannot bind a non-signatory, a contract can bind a non-signatory where it was signed by the non-signatory's agent, or assigned to the non-signatory, or where the party who signed the contract is the "alter ego" of the non-signatory. *See Global Entm't, Inc. v. New York Tel. Co., 2000 U.S. Dist. LEXIS 16038, No. 00 Civ. 2959, 2000 WL 1672327, at *7 (S.D.N.Y. Nov. 6, 2000).*

The facts clearly suggest that Control may be held liable under the ePark Agreement. As noted above, BEAC was merely an investment vehicle. As such, it could not comply with its obligations under the ePark Agreement. Thus, on the same day the ePark Agreement was executed, BEAC simultaneously entered into the Service Agreement with Control. Control (founded by Lazowski -- the sole shareholder) has no officers or board of directors. The Service Agreement was signed on behalf of BEAC and Control by Lazowski -- who signed his name twice, *see* Service Agreement at 6, pursuant to which Control was to act as BEAC's "marketing and sales agent and service call provider for the software and the Product for all service related items regarding BEAC's interest in the venture with Net-Tech Solutions, L.L.C., (the 'ePark venture') . . . ." *Id. at 1*. Control is mentioned throughout the ePark Agreement and is in fact *expressly referred* to as being bound by the provisions of Article III. Indeed, all of the work under the ePark Agreement was performed by NetTech and Control and if Control is held not to be bound by the confidentiality and non-compete provisions these provisions would be meaningless.

[*34] **2. The Copyright and Unfair Competition Claims**

A plaintiff may pierce the corporate veil in an action for copyright infringement and unfair competition where it is established that the corporate officer is a "moving, active conscious force behind [the defendant corporation's] infringement." *Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998)* (quotation marks and citation omitted); *see also Mattel, Inc. v. Robarb's, Inc., 2001 U.S. Dist. LEXIS 11742*, No. 00 Civ. 4866, 2001 WL 913894, at *8 (S.D.N.Y. Aug. 14, 2001).

Lazowski is a corporate officer of BEAC, Control, and ZipPark.com. *See* Lazowski Aff. P 1. Although the issue of whether the ZipPark product infringes upon the rights associated with the Valet 2000 will not be decided on this motion, assuming that there was infringement, plaintiffs have presented sufficient facts demonstrating that Lazowski was the moving force behind such infringement. All of Net-Tech's dealings with BEAC and Control were through Lazowski and Lazowski was the primary actor in the development of ZipPark. As such, the moving defendants' motion to dismiss the claims of copyright infringement and unfair competition [*35] against Lazowski in his individual capacity is denied.

**IV. CONCLUSION**

For the foregoing reasons, the moving defendants' motion for summary judgment with respect to the contract claims and to the claims asserted against Lazowski in his individual capacity is denied. In addition, plaintiffs' unfair competition claim based on false designation of origin or confusion as to source is not preempted by their federal copyright claim. However, to the extent that plaintiffs' claim for unfair competition is based on the copying of Valet 2000, this claim is preempted and therefore dismissed.

The parties are directed to contact Magistrate Judge Fox within ten (10) days of the date of this Opinion and Order to schedule a conference to address any remaining discovery disputes. The parties are further directed to contact this Court after any such disputes have been resolved.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

September 20, 2001